No. 2--04--0870                                          filed:
10/19/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| In re COMMITMENT of JACOB SANDRY | ) | Appeal from the Circuit Court |
| | ) | of Jo Daviess County. |
| | ) | |
| | ) | No. 96--JD--16 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Respondent-Appellee v. Jacob Sandry, | ) | Victor V. Sprengelmeyer, |
| Petitioner-Appellant). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE GROMETER delivered the opinion of the court:

Jacob Sandry (petitioner) filed a petition in the circuit court of Jo Daviess County seeking conditional release pursuant to section 60 of the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/60 (West 2002)). The trial court found that the State had carried its burden of demonstrating that petitioner had not made progress sufficient to warrant relief. Petitioner now appeals, arguing that the trial court erred in accepting the testimony of a psychologist presented by the State and that the trial court's decision is contrary to the manifest weight of the evidence. For the reasons that follow, we affirm.

Before proceeding further, we must address one preliminary issue. This cause comes to us consolidated with another case, In re Detention of Elvis Reed, No. 2--04--0907, which we resolve today in a written order pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23). Though they share a common issue--whether penile plethysmography

passes the Frye test--the ultimate resolutions of the two cases rest on factual matter unique to each. Accordingly, we will sever them for the purpose of decision. However, the following discussion addressing plethysmography is applicable to our resolution of the Reed appeal.

## I. BACKGROUND

On November 25, 1996, the State filed a petition seeking to adjudicate petitioner a delinquent minor in that he committed the offense of aggravated criminal sexual abuse (720 ILCS 5/12--16 (West 1996)). Petitioner was 14 years old at the time. Petitioner was to be released on February 21, 2001. However, on February 16, 2001, the State filed a petition to have petitioner committed under the Act (725 ILCS 207/1 et seq. (West 2000)). On January 31, 2002, the trial court found petitioner to be a sexually violent person. On June 17, 2003, petitioner filed the petition that led to this appeal. Petitioner currently is a resident at the Department of Human Services Treatment Detention Facility in Joliet. He had been at that facility for approximately three years at the time of the hearing on his petition. At the hearing on that petition, the following evidence was adduced.

Dr. Paul Heaton, a clinical psychologist, first testified for the State. Petitioner stipulated that Heaton is an expert in his field. He evaluated petitioner when petitioner was first committed and also conducted a six-month evaluation in April 2003. At no time was Heaton involved in the treatment of petitioner. Heaton updated his evaluation in May 2004 and June 2004. Heaton updated the May 2004 report after only a month because that was the first time petitioner had agreed to undergo testing and a clinical interview. In the course of conducting an evaluation, Heaton stated that he reviews all records pertaining

to the subject as well as any test results. He also seeks to interview treatment providers who have treated the subject.

The State questioned Heaton as to the requirements for conditional release set forth in the Act. See 725 ILCS 207/60(d) (West 2002). Heaton first explained that he was aware of the circumstances of the offense of which petitioner was originally convicted. He then related that petitioner was also responsible for numerous rule violations and "sexual misconduct tickets" during his stays at various treatment centers and places of incarceration over the following few years. While at the Joliet treatment facility, petitioner was found responsible for one major offense of sexual misconduct that involved inappropriate contact with another resident. Heaton acknowledged that these incidents were rule violations rather than criminal offenses. Heaton explained that such a continuing pattern indicates that petitioner has not learned from his past failures.

During the evaluation, Heaton learned that the victim of the offense of which petitioner was convicted was not his only victim. Petitioner had admitted that he had abused numerous others. Within the last year of treatment, Heaton reported, petitioner admitted that he verbally intimidated his victims and used his pet dog to frighten them into submission. Additionally, during the year preceding the hearing, petitioner admitted that he had abused certain victims more frequently than he had initially disclosed. During this period, petitioner also acknowledged that another victim existed.

Heaton further testified that he had diagnosed petitioner with two mental disorder**s**. First, he diagnosed petitioner with paraphilia, not otherwise specified, and antisocial personality disorder. The former diagnosis means that petitioner is sexually attracted to

nonconsenting males and females. The latter disorder concerns "a pervasive pattern of disregard and then the violation of the rights of others." Additionally, Heaton ruled out two diagnoses, depressive disorder and adjustment disorder, from which he originally believed that petitioner possibly suffered.

Heaton relied on a number of actuarial assessment tools in evaluating petitioner. These tools indicated that there was anywhere from a moderate-to-high risk to a high risk that petitioner would reoffend. Heaton explained that petitioner shares many characteristics with others who have gone on to reoffend. Dynamic factors--as opposed to static factors, which do not change--include: anger difficulties, relationship issues, an antisocial lifestyle, antisocial attitudes, and resistance to personal change. The results of the Millon Clinical Multiaxial Inventory, a test that Heaton administered but did not score, showed petitioner to be guarded and suspicious; to view others as not appreciating him and as trying to take advantage of him; to involve himself in unproductive relationships; to be resentful and angry; and to exhibit narcissistic, self-defeating, and avoidant personality traits. The test also suggested that petitioner might suffer from generalized anxiety disorder; however, Heaton testified that other information available to him was insufficient to support such a diagnosis. Another test, the Multiaxial Sexual Inventory, which Heaton also administered but did not score, revealed mixed results. According to Heaton, this test showed that petitioner was able and willing to talk about his past offenses; that he recognizes what he did was wrong; that he takes some responsibility for his actions; and that he was not attempting to lie on the test. However, it also showed that he tended to minimize his past sexual obsession and that he has not taken full

responsibility for his conduct. Heaton then opined that, to a reasonable degree of psychological certainty, petitioner "presents a significant and high risk to re-offend and that his treatment should be continued within a secure facility."

Heaton next addressed possibilities for petitioner's life after release. Heaton stated that, though there are some issues that would need to be addressed, ultimately, if released, petitioner could be returned to his home community following discharge. He stated that petitioner had informed him that his long-term goals are to get a good job, marry, raise a family, and leave Illinois. Although petitioner does not have a job waiting for him, he increased his job skills and demonstrated a willingness to work while within the Joliet facility. Petitioner also acquired a painting certification. Further, if conditionally released, employment would be found for him. As for outpatient treatment, Heaton noted that petitioner had previously received some that was unsuccessful in that petitioner continued to reoffend. Despite completing one program, petitioner continued to act out sexually, which Heaton regarded as problematic in that it showed he did not benefit substantially from that program. Heaton stated that no facilities in Jo Daviess County were sufficient to meet the needs of petitioner.

At the time of the hearing, petitioner was in phase two of the program at the Joliet treatment facility. The program consists of five phases. Heaton noted that petitioner had completed some of the objectives for the third phase. Specifically, of the objectives for the third phase, petitioner had completed all of the cognitive restructuring objectives and one of the objectives for the journaling group, but none for relapse prevention. In phase two, petitioner has completed all of the objectives for cognitive restructuring and journaling as

well as several, but not all, for relapse prevention. Heaton later testified that, in his opinion, an individual should complete phase four prior to release. However, he acknowledged that some individuals have been released in phase three, and he believed that, pursuant to a court order, one individual had been released in phase two.

A polygraph is used during phase two to help determine whether an individual is taking full responsibility for past offenses. Heaton explained that, though passing a polygraph is not required for conditional release, it is "generally necessary" to advance to the third phase. Heaton stated that he had recommended an individual be placed on conditional release even though the individual had not passed a polygraph. Petitioner was initially resistant to taking a polygraph examination; however, he eventually took one. Prior to an examination, the polygrapher interviews the subject. At this time, petitioner acknowledged the existence of an additional victim whom he had not previously disclosed. The examination indicated that petitioner was being deceptive when he denied the existence of additional victims and that he had used force and violence with the victims. Heaton stated that the polygraph played a small but significant part in his overall opinion. Heaton also testified that petitioner will not be allowed to pass into phase three until he passes a polygraph test.

Petitioner had not been found responsible for any major or minor rules violations within the year preceding the hearing; however, Heaton testified that on over 20 occasions, petitioner engaged in outbursts of anger sufficient to be noted in his progress reports. Petitioner acknowledged masturbating while fantasizing in a way that would be considered deviant. Also, within the year before the hearing, petitioner told a female staff member that

he had a crush on her. Additionally, petitioner was inappropriate in his interactions with the staff on at least two other occasions. Heaton ultimately opined that the appropriate setting for petitioner was the facility in which he was currently residing.

During cross-examination, Heaton first acknowledged that petitioner had self-reported to a counselor that he was in an offending cycle, that is, he was engaged in the types of thoughts and fantasies that precede an offense. Heaton agreed that there were secure facilities in the Chicago area that potentially could meet petitioner's needs. Heaton agreed that it was a "good sign" that petitioner had not been charged with any sexual rule violations since starting treatment. Petitioner had also participated in and completed the family survivor's group, which assists residents whose extended families have had difficulties with substance abuse. He completed a thinking-errors group and an empathy group and is involved in a second empathy group. Petitioner was working four jobs within the facility. Additionally, petitioner was involved in cooperation and self-recreating groups as well as a number of other treatment modalities.

Heaton acknowledged that, though he had listed a number of barriers to discharge in his most recent report, the primary barrier was sexual dangerousness. Other individuals have been placed on conditional discharge despite not resolving other issues, such as personal insight or substance-abuse-related problems. Heaton did feel that other such issues are relevant to assessing whether an individual is ready to be discharged. Heaton stated that, since beginning treatment, the only truly violent incident petitioner was involved in was when he punched a hole in a wall on April 1, 2004, because he was angry and frustrated about the death of his cousin.

According to Heaton, petitioner had at least two primary therapists within the year preceding the hearing. Switching therapists would not necessarily have set petitioner back; however, it would take some time to build rapport and trust. Moreover, petitioner has difficulties speaking with male counselors, and one of the counselors who worked with petitioner within the year preceding the hearing was a man. Heaton stated that petitioner's willingness to speak with Heaton was a positive step. Petitioner's counsel then cross-examined Heaton extensively regarding the use of various actuarial tools, including the Static 99 and the MnSOST-R. Heaton later stated that he did not rely on these as stand-alone instruments, but rather viewed them as a part of an evaluation.

Heaton opined that the risk that petitioner would reoffend has diminished over the years, but not significantly so. When asked whether petitioner needed to pass a polygraph prior to being released, Heaton replied that he would like "to see him do much better on the polygraph and to show that he has dealt effectively with the full extent of offense history." Heaton later noted that within the year preceding the hearing, petitioner had acknowledged nearly 60 offending incidents involving 10 victims, though he had previously acknowledged only 25 incidents. Also, during the year preceding the hearing, petitioner admitted that he had been grooming an eleventh victim. This point was contested during cross-examination. Petitioner was incarcerated before he could actually assault that individual.

The State also called Dr. Michael Bednarz, a medical doctor who is board certified in internal medicine and psychiatry. Bednarz did not examine petitioner, but did review his records. Bednarz noted that petitioner had been prescribed Wellbutrin several times, the

most recent being in September 1999. Bednarz, referring to several medical articles, testified that Wellbutrin causes a loss of interest in sex and impairs the ability to engage in sex at a statistically significant rate 57 days after treatment starts. He stated that there is no support for the notion that Wellbutrin enhances sexual function. Bednarz specifically disagreed with the opinion of one of petitioner's experts, which was disclosed during discovery, that Wellbutrin could cause abnormal sexual behavior. He did, however, agree with that expert that it could aggravate bipolar disorder, but, he added, no more than any other antidepressant.

After the State rested, petitioner moved for summary judgment. The trial court denied the motion. Petitioner also renewed an earlier motion to exclude evidence derived from the polygraph examination, and the court reserved ruling. Petitioner then called Dr. Kishore Thampy.

Thampy stated that he is a psychiatrist and is also licensed as a physician and a surgeon. In the course of his practice, he had prescribed Wellbutrin thousands of times. The court certified Thampy as an expert witness. Thampy testified that the common component of the Wellbutrin family of medications is bupropian, which is marketed as Wellbutrin, Wellbutrin SR, and Wellbutrin XL. The difference between the three types of the medication is how fast the drug is released into the patient's system. Chemically, they are the same. All three can affect one's sexual functioning. While they may impair function, they also may increase one's libido. Thampy believed that one should be cautious in prescribing Wellbutrin to sex offenders. Similarly, in a person with bipolar disorder, Wellbutrin could trigger a "frank manic episode," one of the characteristics of

which is hypersexuality. One psychologist (Dr. Kirk Witherspoon, who testified next) had diagnosed petitioner as having bipolar disorder, and, in fact, petitioner had for a time been prescribed a drug, Depakote, that is used to treat bipolar disorder. On cross-examination, Thampy acknowledged that an individual not suffering from bipolar disorder would not experience long-term effects from Wellbutrin after he or she stopped taking it. An individual who did suffer from bipolar disorder could exhibit a long-term effect once the drug triggered a rapid cycling effect, at least until the underlying disorder was treated.

Dr. Kirk Witherspoon next testified. Witherspoon is a licensed clinical psychologist who has a private practice in Illinois. Witherspoon evaluated petitioner as part of the initial commitment, and he has evaluated him twice since then. His evaluation of petitioner included a clinical interview. Witherspoon testified that petitioner had made steady progress in the treatment facility. He noted that petitioner had completed most of the work for phase two as well as a good deal of it for the third and fourth phases. He characterized the phases as arbitrarily defined. He believed the only reason petitioner was still classified as phase two was petitioner's failure to pass a polygraph. Witherspoon criticized the use of the polygraph by the staff at the Joliet facility, because they placed too much reliance on it and tended to regard it as dispositive. Witherspoon acknowledged that, without passing a polygraph, some patients have been released and others have advanced beyond phase two.

Witherspoon testified that, in addition to the core groups that form the basis of the five-phase program, petitioner has made progress in other ancillary groups. These groups included a substance-abuse group (which petitioner participated in not because of a

personal problem, but because of a family issue), an art group, and a cooperation group. Witherspoon also noted that petitioner had worked as a painter while in the facility.

Witherspoon identified several things that concerned him "mildly" about petitioner. He noted that petitioner was sometimes ambivalent about treatment. Like many patients, petitioner is jaded at times and mistrusts the staff, which he believes is inclined to use against him information he divulges during group treatment. Witherspoon also noted that petitioner was angry at times, has left group treatment, and sometimes swore at people. However, Witherspoon testified that such incidents had diminished in the months before the hearing. Witherspoon stated that walking out of group treatment is not an uncommon occurrence during such treatment, and it is preferable to acting out. He characterized petitioner's lashing out verbally as less than ideal. Further, he noted an incident where another resident punched petitioner, and petitioner did not retaliate. Witherspoon also pointed out that, after being told that it was inappropriate to tell a female staff member that he had a crush on her, petitioner did not repeat that behavior.

Witherspoon disagreed with the initial detention of petitioner. According to Witherspoon, petitioner, who had been a ward of the Department of Corrections at the time, was committed because he had engaged in consensual sexual contact with peers on an infrequent basis. Other evaluators, continued Witherspoon, concluded petitioner was a risk to reoffend, even though these acts were not sexually violent.

In the course of evaluating petitioner, Witherspoon performed a number of psychological tests, including the Millon Clinical Multiaxial Inventory III, a Personal Problems Checklist, a Forer Structured Sentence Completion Test, the Multiphasic Sex

Inventory II, the Hanson Sex Attitudes Questionnaire, the Wilson Sex Fantasy Questionnaire, the Abel and Becker Cognitions Scale, the Bumby Cognitive Distortions Scale, the Carich-Adkerson Sex Offender Risk Assessment Scale, the Carich-Adkerson Victim Empathy and Remorse Self-Report Inventory, the Social Avoidance and Distress Scale, the Relapse Prevention Interview, the Hare PCL-R, and the SVR-20.

Unlike Heaton, Witherspoon did not use the Static 99 or the MnSOST-R. He explained that this was because these tools are actuarial instruments and there is a "great deal of controversy" regarding whether they are actually tests. Witherspoon added that he felt they would be misleading to the court. He also stated that the MnSOST-R had not been normed for adolescents, such as petitioner, whose behavior occurred when he was an adolescent. He felt the Static 99 was slightly more reliable; however, it too had not been normed for adolescents.

As for petitioner's mental history, Witherspoon diagnosed him as bipolar, though he changed his initial diagnosis of bipolar affective disorder to bipolar II disorder. Witherspoon believed that the disorder was in remission at the time of the hearing. Witherspoon disagreed with the diagnosis of petitioner's treatment providers, which was that petitioner suffered from pedophilia, nonspecified, and severe antisocial personality disorder. One aspect of the diagnosis of pedophilia that Witherspoon questioned was its reliance upon a penile plethysmograph. Witherspoon was not concerned about petitioner's recent admission of additional victims and incidents. As he explained, "Disclosure of prior offenses or minimization or denial, statistically aren't related to re-offense risk and that's based on a number of meta-analyses that have been done." In fact,

Witherspoon believed that, of the 17 or 18 people he had evaluated, petitioner presented the lowest risk of reoffending.

Regarding possibilities for petitioner's life following release from the facility, Witherspoon stated that he was aware of a halfway house in Chicago that would be appropriate. He also stated that he was aware of one individual who had been placed in Rockford. Witherspoon testified that petitioner's goals for life outside of detention were reasonable. Witherspoon saw no indication that petitioner would not comply with directions from the court should he be conditionally released. Witherspoon opined that petitioner presented a low risk of reoffending. Witherspoon acknowledged that petitioner previously had reoffended while receiving outpatient treatment.

Petitioner testified on his own behalf. Petitioner stated that he had been at the facility in Joliet for approximately three years and had been in treatment for about two years. He testified that he was currently working on phase four cognitive restructuring work, which involves dealing with the thoughts, values, and beliefs that a sexual offender possesses when offending, as well as ways to change them. Petitioner said that he felt good about the treatment and that he believed he was "doing better than most right now."

Petitioner related that at one point, he was "cycling," by which he meant he was entering an offending cycle in that he was having deviant fantasies. After three days, he recognized the cycle and started to deal with it. Petitioner dealt with this through his journaling and relapse-prevention groups. Petitioner was able to work out of the cycle.

Petitioner discussed the groups that he had taken part in. He described the goals of and techniques used in the various groups. He related some of the things he had

learned and been able to deal with through these groups. Specifically, he explained that the empathy group provided him with perspective as to others. The cooperation group helped him learn how to better get along with others. Through the familial survivors group, he was able to deal with his father's death and with alcohol-related issues. In introduction to thinking errors, he learned that minimization was a tactic he used to avoid responsibility and how to avoid using that tactic.

At one time, petitioner was working four jobs in the facility. He worked on the paint crew, cleaned the healthcare unit, and worked "dietary breakfast and dietary lunch." The institution's rules changed, however, limiting residents to one job. Therefore, at the time of the hearing, petitioner was working only on the paint crew. Petitioner received a certification from an outside contractor in basic painting, "general contracting type painting," and dry walling.

Counsel then questioned petitioner regarding his feelings about his past offenses. Petitioner stated that he felt bad about them and that he could have stopped but chose not to do so. He testified that he wished he had never committed them and that he wished he had not hurt anyone. He recognized that when he was offending, "it was all about me, sexual gratification; it wasn't worrying about anybody else's feeling or thoughts or anything like that." Petitioner requested and participated in an apology session with one of his victims, which, he stated, was difficult. Petitioner believed the session helped both him and his victim.

Petitioner stated that when he is in group therapy and feels like he wants to "verbally attack" someone, he removes himself from the situation for a few minutes so he

can relax. Then, he returns and tries to work out his differences with that person. He also said that he was receptive to others' attempts to resolve conflicts with him.

Regarding recent disclosures made prior to the polygraph examination, petitioner testified that all but one involved conduct prior to his entering treatment. The other incident occurred in November 2001, and it "has not been found true yet." Petitioner stated that he had not had inappropriate sexual contact with anyone since beginning treatment. Petitioner also stated that the reason he refrained from disclosing one victim was fear of being prosecuted. As for the number of victims, petitioner stated that he disclosed them accurately when incarcerated in the Department of Corrections.

Petitioner testified that he felt treatment was a good thing, though perhaps too aggressive at times. He noted that it was more comprehensive than the treatment he received from the Department of Corrections. Petitioner stated that he would not cease treatment if released and that he felt he needed treatment for the rest of his life, because it is a never-ending process and there is always something to learn.

Petitioner related that, by virtue of a company called Secret Pen Pal, he has been corresponding with five women. He stated that they were over the age of 18 and aware that he is an inmate. He also testified that, in his second letter to each pen pal, he disclosed that he is a sexually violent person. Petitioner acknowledged masturbating to one of the letters. However, petitioner stated that the relationships are simply friendships that allow him to talk to people from the outside world.

Petitioner stated that if released, the first thing he would do is register as a sex offender. Then he would get into treatment and build a support team. Petitioner also

wishes to find a job in the construction field. In 10 years, petitioner would like to have a family, maybe children, and "get back into farming" or "own a painting crew." Petitioner stated that he initially would like to be released in the Rockford or Chicago area, because he wishes to be in treatment with others who have gone through inpatient treatment. He believed that such people would be more beneficial to interact with in a group setting, because of the common experience that they shared. Petitioner would provide members of his support team, such as family members, with information so that they could recognize if he were entering an offending cycle and confront him. If he recognized himself to be in an offending cycle, he would contact a member of his support team, a conditional release officer, or, if necessary, the police. Part of the prevention plan is to create flash cards outlining the offending cycle, to enable both the patient and his or her support group to recognize it. Petitioner stated that he would carry the flash cards with him and also give them to members of his support team. Petitioner also expressed his preference to reside in a halfway house, because, as he noted, he has been institutionalized since he was 15 years old and did not know how to live on his own. Finally, petitioner stated that if his petition were denied, he would be disappointed, but he would return to the facility and work hard at his treatment to show that he is willing to change.

The State then conducted cross-examination. Petitioner acknowledged that he had only recently completed a number of his core group classes. Petitioner agreed that it might be difficult for members of his family to provide support, since they are also family members of some of his victims. Petitioner also agreed that if kept in treatment, there was more he could learn about how to stop his cycle. As of the time of the hearing, the options

for dealing with his problem that petitioner had learned were external ones. Internal options also exist that could be put into place.

Regarding his pen pals, petitioner recounted one situation when a pen pal informed him that she had been abused. He spoke with a counselor, and the counselor advised him to cease contact with that individual. Petitioner wrote her a letter stating that he could not correspond with her, because he is a sexually violent person. Petitioner testified that the staff at the facility does not read his mail, but they check pictures to make sure they are not inappropriate. Petitioner acknowledged that he has some issues with controlling his anger and that he has not participated in the anger management group, which is an ancillary group.

The trial court concluded that the State had met its burden of proving by clear and convincing evidence that petitioner had not made sufficient progress to be released, although it did recognize that petitioner had made significant progress. The trial court stated that it had considered all of the factors required by section 60 of the Act (725 ILCS 207/60 (West 2002)). It specifically found Heaton to be credible. Additionally, the trial court explained two additional facets of its decision. First, it rejected petitioner's evidence concerning the drug Wellbutrin, stating that this evidence was not a factor in its decision. Second, the trial court commented extensively on the use of a polygraph during treatment. The trial court first noted that the actual questions that were posed to petitioner that he "supposedly failed" were never revealed to it. The court found it "curious" that passing a polygraph was part of the treatment program. It characterized this requirement as forcing petitioner to do something indirectly that could not be accomplished directly. That is, the

court observed that it could not require petitioner to pass a polygraph to qualify for release. The court stated that it was "severely bothered by that." The court concluded, "So far as I am concerned, [petitioner] is never going to be required to show he's passed a polygraph to be eligible for release in any future proceedings in this court." Petitioner then filed this timely appeal.

## II. ANALYSIS

On appeal, petitioner raises two main points. First, he argues that it was error for the trial court to rely on Heaton's opinion, because it was based in part on petitioner's performance on the polygraph test and a penile plethysmograph test (PPG). Second, he asserts that the trial court's denial of his petition was contrary to the manifest weight of the evidence. The State disputes these contentions and also contends that the issues are waived and that, in any event, are at most harmless error.

## A. Heaton's Opinion

Petitioner contends that it was error for the trial court to find Heaton's opinion credible. He first points out that Heaton had never treated petitioner, and therefore his opinion was based largely on a review of tests, reports, and information in petitioner's records. Petitioner then notes that those files include results of polygraph testing and PPG testing. Those devices, asserts petitioner, have been found unreliable. Thus, reasons petitioner, Heaton's opinion was suspect and the trial judge should not have relied upon it. Petitioner goes on to argue that these devices have been found to be inadmissible absent a Frye hearing (see Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)). Since

there was no Frye hearing in this case, petitioner asserts, the trial judge lacked the discretion to admit the results of those tests.

We first turn to the State's contention that petitioner waived any objection to the admission of this evidence. As for the PPG, we note that petitioner did file an appropriate motion in limine asserting that PPG testing does not meet the standard set forth in Frye. The State contends that this issue is waived due to petitioner's failure to interpose a contemporaneous objection to the admission of Heaton's report, which included a discussion of PPG testing. See Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co., 163 Ill. 2d 498, 502 (1994). Normally, a motion in limine is insufficient to preserve an error for review; a party must also interpose an objection when the disputed evidence is offered at trial. Zook v. Norfolk & Western Ry. Co., 268 Ill. App. 3d 157, 162 (1994). One of the reasons for this rule is that circumstances at trial may bear upon the admissibility of an item of evidence. See People v. McClain, 60 Ill. App. 3d 320, 324 (1978) ("Its relevance, however, could not be tested until after the witness testified"). In Spyrka v. County of Cook, 366 Ill. App. 3d 156, 165 (2006), the First District recently made the following observation:

"Once the full context of the evidentiary issue develops at trial, such that a motion thereon no longer presents the risk of an erroneous ruling that a pretrial motion in limine presents, any ruling on the merits is not interlocutory, and the unsuccessful movant need not object further to preserve the issue for review."

In this case, the issue is whether PPG testing satisfies the Frye standard. There is really no evidentiary context that could develop at trial relevant to deciding this question. The issues pertinent to a Frye hearing typically transcend any particular case. In re Commitment of Simons, 213 Ill. 2d 523, 531 (2004), citing People v. Miller, 173 Ill. 2d 167, 204 (1996) (McMorrow, J., concurring). A new scientific methodology either satisfies Frye or does not--at least insofar as it is offered for the same or a sufficiently similar purpose in a later proceeding. Accordingly, we believe that under these unique circumstances, there was no need to interpose a further objection. Requiring a further objection would elevate form over substance.

Regarding the polygraph test, petitioner did object on the ground that he received the results only on the morning of the hearing but did not otherwise question their admissibility. The State points out that an objection on a specific ground forfeits all objections on unspecified grounds. Auton v. Logan Landfill, Inc., 105 Ill. 2d 537, 548 (1984). Waiver, however, is a prerogative of this court. Village of South Elgin v. Waste Management of Illinois, Inc., 348 Ill. App. 3d 929, 934 (2004). Here, because the results were received shortly before the hearing, it would have been difficult, if not impossible, for petitioner to analyze the report and interpose a meaningful objection. Though the State is technically correct and this issue could be deemed waived, we conclude that, under the circumstances, it would be inequitable to do so.

However, we do note that the trial judge expressly disavowed any reliance on the results of the polygraph examination in making his decision, emphatically stating that petitioner would never be required to pass a polygraph test before the court would find him

eligible for conditional release. Petitioner attempts to avoid this aspect of the trial court's ruling by pointing to the presumption that a trial court considers all admissible evidence in making a ruling and that, by overruling an objection, a trial court manifests its belief that evidence is relevant. See People v. Stewart, 130 Ill. 2d 623, 627-28 (1970). While generally valid, applying this presumption to defeat the expressed intent of the trial court would be absurd. Quite simply, the trial court did not rely on this evidence, and petitioner was therefore not prejudiced by its admission. Any alleged error was harmless, and we need not consider this issue further.

Hence, the only question before us is whether Heaton's opinion should have been disregarded by the trial court because it was based in part on PPG testing. As petitioner notes, no Frye hearing was held, and this court has stated that, absent an adequate showing in accordance with Frye, "we are not convinced that penile plethysmograph tests have probative value and question whether the results should be considered by the trier of fact." People v. Swanson, 335 Ill. App. 3d 117, 128 (2002); see also In re Detention of Hughes, 346 Ill. App. 3d 637, 652 (2004) ("Because there was no Frye determination in this case, and no such prior determination in any reported case in Illinois, it was error to allow Wilson to base his opinion on the results of the plethysmograph"). If this indeed were the last word on the subject, we would be compelled to reverse in this case. However, since these two cases were decided, the supreme court issued its opinion in Simons, 213 Ill. 2d 523. That case, which involved the use of actuarial instruments to assess the future dangerousness of sex offenders, clarified and altered the manner in

which the courts of review of this state approach Frye questions. Simons, 213 Ill. 2d at 529-33.

In Simons, the supreme court held that the appropriate standard of review for Frye issues is de novo. Simons, 213 Ill. 2d at 532. In conducting this analysis, a court of review is not bound by the record developed during trial and may consider "sources outside the record, including legal and scientific articles, as well as court opinions from other jurisdictions." Simons, 213 Ill. 2d at 531. In Simons itself, the issue presented to the supreme court was whether the trial court erred in admitting the testimony of two psychologists without conducting a Frye hearing, because their testimony was based upon several actuarial instruments. Simons, 213 Ill. 2d at 529. Thus, no Frye hearing had occurred before the trial court. Instead, the supreme court conducted one in the first instance on appeal. Simons, 213 Ill. 2d at 535. The State seeks to avail itself of that same procedure here and has submitted to us a great deal of material in support of its assertion that PPG testing satisfies the Frye standard.

The Frye test, as articulated in Illinois, requires the proponent of an opinion based upon a new or novel scientific methodology to show that it is " 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " Simons, 213 Ill. 2d at 529-30, quoting Frye, 293 F. at 1014. "General acceptance," however, does not mean universal acceptance. Simons, 213 Ill. 2d at 530. Nor does it require "unanimity, consensus, or even a majority of experts" to accept the methodology. Simons, 213 Ill. 2d at 530. In describing the manner of review, the supreme court stated that "the focus is primarily on counting scientists' votes." Simons, 213 Ill. 2d at 532. We do not take this to

mean that any strictly numerical calculus is required, particularly in light of the supreme court's plain statement that a majority of experts is not required. Instead, we believe our role is to survey the field and determine whether the methodology in question is accepted by some reasonable subset of experts within that field. Moreover, it is also necessary that the experts who rely upon the methodology do so "reasonably." Simons, 213 Ill. 2d at 530.

In Illinois, we apply a rather pure version of the test articulated in Frye. The Frye court articulated but one condition: "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye, 293 F. at 1014. Some courts have grafted reliability or validity onto Frye. For example, in State v. Schwartz, 447 N.W.2d 422, 424 (Minn. 1989), a Minnesota court wrote, "We have rephrased the Frye standards to require that experts in the field generally agree that the evidence is reliable and trustworthy." In People v. Leahy, 8 Cal. 4th 587, 594, 882 P.2d 321, 324-25, 34 Cal. Rptr. 2d 663, 666-67 (1994), the Supreme Court of California, while adhering to Frye, articulated the following conditions for the admissibility of a new scientific methodology: (1) the reliability of the method, and (2) the use of correct scientific procedures. See also Leftwich v. State, 245 Ga. App. 695, 696, 528 S.E.2d 779, 781 (2000) ("[Defendant] bore the burden of establishing the reliability of this particular test by showing that subsequent to the Gentry decision, this test had earned acceptance in other jurisdictions or by offering expert testimony to establish the scientific validity and reliability of this procedure"). In this state, our supreme court has made it clear that an inquiry into the validity or reliability of a methodology is outside the scope of the Frye test. In Simons, the supreme court plainly stated that "[u]nder the Frye standard, the

trial court is not asked to determine the validity of a particular scientific technique." Simons, 213 Ill. 2d at 532. In Donaldson v. Central Illinois Public Service Co.,199 Ill. 2d 63, 81 (2002), overruled on other grounds, Simons, 213 Ill. 2d at 532, the supreme court held, "The trial court is not required to conduct a two-part inquiry into both the reliability of the methodology and its general acceptance." Indeed, the Donaldson court explained, "The determination of the reliability of an expert's methodology is naturally subsumed by the inquiry into its general acceptance in the scientific community." Donaldson, 199 Ill. 2d at 81. In other words, once it is determined that a methodology is generally accepted, it follows that it has achieved a sufficient degree of reliability and validity to cross the threshold of admissibility. This is not to say, of course, that the reliability or validity of a methodology cannot be questioned at trial by an opposing litigant.

Additionally, in Simons, the supreme court set forth one additional requirement--an expert's acceptance of a particular methodology must be reasonable. Simons, 213 Ill. 2d at 530, citing Donaldson, 199 Ill. 2d at 77. "Reasonable" obviously cannot mandate an inquiry into "validity" or "reliability," for those things are clearly excluded by Simons and Donaldson. Thus, it appears that the question of whether an expert's reliance is reasonable constitutes a rather low standard. Without inquiring into the validity or reliability of a particular methodology, our analysis appears to be limited to whether there is some rational basis--not necessarily a correct basis--for an expert to rely upon it, guided largely by common sense.

For example, in People v. Buening, 229 Ill. App. 3d 538, 545-46 (1992), the court held that the horizontal-gaze-nystagmus test passed the Frye standard as a qualitative

indicator, but not a quantitative measure, of impairment. That test measures an individual's impairment due to the consumption of alcohol by assessing the involuntary jerking of the individual's eyeball. Buening, 229 Ill. App. 3d at 539. That alcohol consumption affects one's motor skills is not a controversial position. Hence, there is a plausible connection between the test and what it seeks to measure. Whether the measure is valid is outside of the scope of the inquiry. Conversely, while a great many may subscribe to the proposition that the location of the stars on the day of one's birth is a great influence upon one's life, nothing, save mystical, unexplained forces, can explain this purported influence. In other words, there is no plausible connection, and an opinion based upon such factors would not satisfy Frye regardless of how many people within that given field accepted the connection. In any event, we suspect that, more often then not, the reasonableness standard will be satisfied where a significant subset of experts accepts a methodology.

From Simons then, the contours of our inquiry are limited to whether there is some reasonable connection between the methodology and what it seeks to measure and whether some substantial subset of experts within the field accepts it. Simons, 213 Ill. 2d at 530. The reasonableness inquiry is fairly straightforward in this case. Quite simply, penile engorgement is a plausible measure of sexual arousal. This observation ends the reasonableness portion of the inquiry.

We now turn to the question of whether PPG testing is generally accepted, as "general acceptance" is defined in Simons, within the field consisting of those experts who specialize in treating sex offenders, such that experts may rely upon it in formulating

qualitative opinions about the future dangerousness of sex offenders. In support of the proposition that PPG testing meets the Frye standard, the State calls our attention to numerous cases, statutes, regulations, law review articles, and articles from other scholarly journals. It also points to material available on the Internet that evinces the use of PPG testing in various states. We agree with the State and hold that this material, along with additional material our research has uncovered, demonstrates that a significant subset of experts considers PPG testing a useful tool for treating and evaluating sex offenders. We now turn to the particulars of this issue.

The supreme court began its analysis in Simons by observing that experts in at least 19 other states have relied on actuarial assessment in predicting recidivism among sex offenders. Simons, 213 Ill. 2d at 535-36. Similarly, the use of PPG testing is mentioned in the case law of at least 21 other states. See R.D. v. State, 706 So. 2d 770, 775 (Ala. Crim. App. 1997); Nelson v. Jones, 781 P.2d 964, 969 (Alaska 1989) (PPG useful in treatment, though not reliable for assessment of sexual deviance); People v. Alexander, No. B173917 (Cal. App. June 8, 2005) (unpublished opinion); Elijah T. v. Richard T., No. ___ (Conn. Super. April 5, 1999) (unpublished opinion); Tuttle v. State, 215 Ga. App. 396, 396, 450 S.E.2d 863, 864 (1994); State v. Naone, 92 Haw. 289, 295, 990 P.2d 1171, 1177 (App. 1999); State v. Walker, 125 Idaho 11, 13, 867 P.2d 244, 246 (App. 1993) (considering results of PPG test without discussing admissibility); In re Detention of Hollins, 715 N.W.2d 767 (Iowa Ct. App. 2006); Pool v. McKune, 267 Kan. 797, 806, 987 P.2d 1073, 1079 (1999) (finding "rational connection between [PPG] testing and the legitimate penological goal of rehabilitation"); Commonwealth v. Rosenberg, 410

Mass. 347, 355, 573 N.E.2d 949, 954 (1991) (trial court properly instructed jury that PPG was not commonly used but had a " 'fair degree of reliability' "); Awes v. Minnesota Department of Health, No. A05--220 (Minn. App. November 22, 2005); State v. McKinney, 110 N.C. App. 365, 374, 430 S.E.2d 300, 305 (1993); In re Conduct of Gustafson, 327 Or. 636, 639, 968 P.2d 367, 370 (1998); In re Care & Treatment of Tucker, 353 S.C. 466, 469, 578 S.E.2d 719, 721 (2003); In re A.J.H., No. M2005--00174--COA--R3--PT (Tenn. Ct. App. June 23, 2005); Swanson v. State, No. 05--04--01820--CR (Tex. App. September 22, 2005) (unpublished order) ("The psychiatrist also stated he would like to give appellant a plethysmograph test, which could help determine whether appellant was sexually aroused by children"); Parker v. Dodgion, 971 P.2d 496, 499 n.6 (Utah 1998) (recognizing usefulness of PPG in treatment and diagnosis of sex offenders, while acknowledging controversy regarding its usefulness for screening purposes); In re C.H., 170 Vt. 603, 749 A.2d 20 (2000); Billips v. Commonwealth, 48 Va. App. 278, 307, 630 S.E.2d 340, 355 (2006); In re Detention of Halgren, 156 Wash. 2d 795, 806, 132 P.3d 714, 722 (2006) (PPG useful for diagnosing and treating sex offenders); Von Arx v. Schwarz, 185 Wis. 2d 645, 650-51, 517 N.E.2d 540, 542 (1994); Leyba v. State, 882 P.2d 863, 864 (Wyo. 1994) (observing that consent to PPG testing is required for admission to a Nebraska program for sex offenders). This rather lengthy citation of case law is, of course, not set forth to establish the validity of PPG testing. Indeed, many of these cases say little about that subject and merely document its use at some stage in the treatment of a sex offender. At this stage of the inquiry, our only concern is general acceptance; accordingly, we mention

these cases for no other purpose than to show that PPG testing is used extensively across the nation.

Noting such cases was the first step the supreme court took in Simons. For example, it cited In re Risk Level Determination of R.B.P., 640 N.W.2d 351, 353-56 (Minn. App. 2002), a case that discussed the application of the MnSOST-R, an actuarial instrument, without discussing its admissibility. Likewise, in State v. McKinniss, 153 Ohio App. 3d 654, 661, 795 N.E.2d 160, 165 (2003), another case the supreme court relied on in Simons, the court considered the results of several actuarial tools without mentioning the issue of admissibility. The point, then, of the citation of such cases in Simons was apparently to show that actuarial instruments are widely used. We set forth the cases in the preceding paragraph for that same purpose. See also Berthiaume v. Caron, 142 F.3d 12, 17 (1st Cir. 1998) ("[T]he plethysmograph is widely used in the scientific community for the treatment of pedophilia; its use for screening is debatable and the scientific community is not of one mind; and whether to administer the test was a question of professional judgment"); S. Freitas, Mentally Disordered Offenders: Who Are They? What Are Their Needs?, 61 Fed. Probation 33, 34 (1997) (noting use of PPG in federal correctional system).

The next step the supreme court took in Simons was to note that courts in eight states had concluded that actuarial risk assessment either passed the Frye test or was not subject to it. In In re Detention of Halgren, 156 Wash. 2d 795, 806-07, 132 P.3d 714, 719 (2006), the Supreme Court of Washington held that, for the purpose of diagnosis, it was not necessary to hold a Frye hearing regarding PPG testing, because "no new method of

proof or scientific evidence was at issue." In <u>Doe ex rel. Rudy-Glanzer v. Glanzer</u>, 232 F.3d 1258, 1266 (9th Cir. 2000), the court observed that "courts have accepted that penile plethysmographs can help in the treatment and monitoring of sex offenders." However, the court further noted that PPG testing has "no indicia of reliability as evidence at trial." <u>Doe ex rel. Rudy-Glanzer</u>, 232 F.3d at 1266. This latter observation, however, would appear to be relevant to reliability, rather than general acceptance. Also, in <u>Billips</u>, 48 Va. App. at 307, 630 S.E.2d at 355, the court held, "Upon these circumstances, we conclude that the information in the risk assessment report concerning Billips's penile plethysmograph examination had the requisite indicia of reliability to permit the sentencing judge to receive and consider that information at the sentencing hearing." Thus, some case law supports the admission of PPG testing in some circumstances.

The <u>Simons</u> court noted that in no state had expert testimony based upon actuarial risk assessment been held inadmissible. This is not the case regarding PPG testing. However, the existence of foreign authority holding that a methodology does not pass <u>Frye</u> is not particularly compelling where the foreign jurisdiction applies a more stringent version of the <u>Frye</u> test. In <u>Donaldson</u>,199 Ill. 2d at 80, the supreme court emphasized that Illinois does not follow a "<u>Frye</u>-plus-reliability" test, which the Fourth District of this court sought to adopt in a pair of cases (see <u>Harris v. Cropmate Co.</u>, 302 Ill. App. 3d 364, 368 (1999); <u>First Midwest Trust Co. v. Rogers</u>, 296 Ill. App. 3d 416, 427 (1998)). We also note that jurisdictions applying the test set forth in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 592-93, 125 L. Ed. 2d 469, 482, 113 S. Ct. 2786, 2796 (1993), must make "a preliminary assessment of whether the reasoning or methodology underlying the

testimony is scientifically valid"; thus, any rejection of PPG testing by such a jurisdiction is not persuasive here. Where a jurisdiction uses a more stringent test not employed in this state, its rejection of such evidence is not persuasive.

State courts that have rejected PPG testing have done so due to problems with the test's reliability. A North Carolina court found an opinion based in part upon PPG testing properly excluded, because "the evidence *** by no means established the reliability of the plethysmograph." State v. Spencer, 119 N.C. App. 662, 666, 459 S.E.2d 812, 815 (1995). In Cooke v. Naylor, 573 A.2d 376, 378-79 (Me. 1990), the Supreme Court of Maine rejected PPG testing, stating, "In the absence of any proof that this evidence was scientifically reliable or could be of benefit to the trier of fact, we find no error in the court's decision not to admit it." Unlike these courts, our inquiry does not include reliability.

Federal courts, applying the test set forth in Daubert, 509 U.S. at 592-95, 125 L. Ed. 2d at 482-84, 113 S. Ct. at 2796-97, have rejected PPG testing for the same reason. See Glanzer, 232 F.3d at 1266; United States v. Powers, 59 F.3d 1460, 1471 (4th Cir. 1995) (affirming lower court's determination that PPG testing failed the scientific-validity prong of Daubert). Daubert mandates that a new scientific methodology be reliable to be admissible. Daubert, 509 U.S. at 589, 125 L. Ed. 2d at 480, 113 S. Ct. at 2795. To that end, courts applying the Daubert standard must inquire into such things as whether a theory or technique can be tested, as well as the known or potential rate of error. Daubert, 509 U.S. at 592-95, 125 L. Ed. 2d at 482-84, 113 S. Ct. at 2796-98. As noted previously, in Illinois, these questions are beyond the scope of our inquiry. While they may be proper subjects to raise during cross-examination, they do not bear on admissibility in this state.

Here, once the rather low threshold of reasonability is crossed, our inquiry focuses solely on general acceptance. Simons, 213 Ill. 2d at 532 ("Under the Frye standard, the trial court is not asked to determine the validity of a particular scientific technique").

The Simons court also noted that a number of states mandate actuarial risk assessment to assess the likelihood of recidivism. Simons, 213 Ill. 2d at 539. Here, the State has cited administrative regulations and statutes from 11 states that reflect the use of PPG testing to treat sex offenders. See Ala. Admin. Code r. 950--1--3--.12 (2005); Ark. Admin. Code r. 004 00 002 (2006) ("Assessments of adult offender risk will be based on actuarial analyses, information obtained from interview, psychological testing and evaluation, review of relevant records and historical data, and polygraph or penile plethysmograph, if deemed necessary by the team conducting the evaluation"); Alaska Stat. §11.61.127 (2006); Iowa Admin. Code r. 201--38.3(692A) (2006) ("The risk assessment score will be determined following a review of the following documents: the presentence investigation report, court documents, clinical assessments, treatment records, polygraph reports, plethysmograph reports, employee records, school records, military records, and child protection services records of the department of human services. The risk assessment score is used to determine the level of risk to reoffend"); Minn. R. 2955.0160 (2006); Or. Admin. R. 413--060--0430 (2006) ("For juveniles who exhibit moderate to high risk according to the 'Risk Assessment Profile,' assessment of deviant arousal patterns may be conducted using the penile plethysmograph for males and the photoplethysmograph for females;" however, the regulation also states that the results should not be used in court but does not state why they should not be so used); 22 Tex.

Admin. Code §810.153 (2006) ("The plethysmograph shall be used to identify the clients who manifest excessive deviant arousal in response to stimuli depicting sexual abuse, discernment of lack of arousal to stimuli of consenting sex, minimization of distortions evident in self-report level of arousal, evaluation of treatment efficacy, and enhancement of certain forms of behavioral treatment" (emphasis added)); Utah Admin. Code 251--109(13)(c) (2006); 18 Va. Admin. Code §125--30--100 (2006); Wash. Admin. Code §246--930--310 (2006) ("When obtained, physiological assessment data shall not be used as the sole basis for offender risk assessment and shall not be used to determine if an individual has committed a specific sexually deviant act. Providers shall recognize that plethysmographic data is only meaningful within the context of a comprehensive evaluation and/or treatment process"); see also A. Graeber, McKune v. Lile and the Construction of Constitutional Protections for Sexual Offenders, 23 Rev. Litig. 137, 150 (2004) (Kansas's sex-abuse treatment program employs PPG testing).

In Simons, the supreme court also relied on academic literature supporting the proposition that actuarial assessment is generally accepted among those who treat sex offenders. Simons, 213 Ill. 2d at 537-38, citing Roeling v. State, 880 So. 2d 1234, 1239 (Fla. App. 2004). Regarding PPG testing, a review of the academic literature reveals that a substantial number of experts consider it useful for dealing with sex offenders. See J. Schober, P. Kuhn, P. Kovacs, J. Earle, P. Byrne & R. Fries, Leuprolide Acetate Suppresses Pedophilic Urges and Arousability, Vol. 34, No. 6 Archives of Sexual Behavior 691, 699 (December 2005) ("At baseline, Abel Assessment and PPG accurately detected pedophilic interest in 100 and 80% of subjects, respectively"); J. Fabian, The Risky

Business of Conducting Risk Assessment for those Already Committed as Sexually Violent Predators, 32 Wm. Mitchell L. Rev. 81, 86 (2005) ("Further, the use of plethysmography in order to obtain a current snapshot of the patient's sexual arousal system should also be employed"); G. Woodworth & J. Kadane, Expert Testimony Supporting Post-Sentence Civil Incarceration of Violent Sexual Offenders, 3 Law, Probability, & Risk 221, 229 (2004) ("The single best predictor was phallometric assessment of deviant sexual preference (plethysmography)); M. Carter, K. Bumby & T. Talbot, Promoting Offender Accountability and Community Safety through the Comprehensive Approach to Sex Offender Management, 34 Seton Hall L. Rev. 1273, 1285 (2004) ("Further, psychosexual assessments may incorporate the use of psychophysiological measures (e.g., penile plethysmography, viewing time) to assess objectively the presence of deviant sexual arousal, preference, and interest"); E. Janus & R. Prentky, Forensic Use of Actuarial Risk Assessment with Sex Offenders: Accuracy, Admissibility and Accountability, 40 Am. Crim. L. Rev. 1443, 1468 (2003) ("In their combined sample, they found support for the predictive validity of ratings on the Psychopathy Checklist, penile plethysmographic assessment, and prior criminal history"); A. Schlank & R. Harry, The Treatment of the Civilly Committed Sex Offenders in Minnesota: A Review of the Past Ten Years, 29 Wm. Mitchell L. Rev. 1221, 1226-27 (2003) ("Only through constant observation, and with the assistance of polygraph examinations and measures of disordered sexual arousal/interest, such as a penile plethysmograph or the Abel Assessment, can the staff be assured that the patients have progressed to a point where they can be gradually re-integrated into the community"); B. McKay, The State of Sex Offender Probation Supervision in Texas, 66

Fed. Probation 16, 17 (2002) ("Penile plethysmography gained some measure of acceptance in sex offender treatment circles in the 1970s"); R. Wilson, The Cradle of Abuse: Evaluating the Danger Posed by a Sexually Predatory Parent to the Victim's Siblings, 51 Emory L.J. 241, 262 n.88 (2002), citing I. Barsetti, The Differentiation of Intrafamilial and Extrafamilial Heterosexual Child Molesters, 13 J. Interpersonal Violence 275, 284 (1998) (noting that "a 'substantial proportion' of intrafamilial molesters, 68.4%, display deviant sexual arousal" when subjected to a PPG test); C. Mee & H. Hall, Risky Business: Assessing Dangerousness in Hawaii, 24 U. Haw. L. Rev. 63, 105 n.227 (2001) ("Yet research findings show that the plethysmograph is the single best predictor of sexual violence"); V. Vieth, When the Child Abuser is a Child: Investigating, Prosecuting and Treating Juvenile Sex Offenders in the New Millennium, 25 Hamline L. Rev. 47, 73 (2001) ("Some researchers suggest intelligence testing, while others rely on polygraph and plethysmograph testing"); R. Hamill, Recidivism of Sex Offenders: What You Need to Know, 15 Criminal Justice 24, 29 (ABA 2001) (citing 1996 and 1998 studies by R. Karl Hanson and Monique T. Bussiére that identified "plethysmographic preference for children" as having the strongest predictive value among 21 factors for predicting sexual recidivism--"plethysmographic preference for boys" was listed as the twelfth strongest indicator); L. Barnickol, Missouri's Sexually Violent Predator Law: Treatment or Punishment?, 4 Wash. U.J.L. & Pol'y 321, 338 (2000) ("States could base these treatment schedules on information compiled from lie-detector tests and penile plethysmograph tests, a test which measures sexual arousal"); R. Schopp, M. Scalora & M. Pearce, Expert Testimony and Professional Judgment:  Psychological Expertise and Commitment as a

Sexual Predator after Hendricks, 5 Psychol. Pub. Pol'y & L. 120, 135 (1999) ("Deviant sexual preferences, as measured through plethysmographic assessment, increase the probability of recidivism"); J. Cornwell, N. Jacobi & P. Witt, The New Jersey Sexually Violent Predator Act: Analysis and Recommendations for Treatment of the Sexual Offenders in New Jersey, 24 Seton Hall Legis. J. 1, 12-13 (1999) ("Behavioral theories suggest that sexual arousal to deviant sexual stimuli, typically as assessed in the laboratory through penile plethysmography, is associated with increased performance of the deviant sexual behavior to which the individual is aroused. This seemingly plausible hypothesis has been best supported among child molesters who molest children outside their own families and has been less supported, although still to a statistically significant degree, among rapists"); J. Bailey & A. Greenberg, The Science and Ethics of Castration: Lessons from the Morse Case, 92 Nw. U.L. Rev. 1225, 1226 (1998) ("Paraphilias can often be assessed via penile plethysmography"); J. Becker & W. Murphy, What We Know and Do Not Know About Assessing and Treating Sex Offenders, 4 Psychol. Pub. Pol'y & L. 116, 125 (1998) ("However, two factors--deviant sexual arousal, as measured by penile plethysmography, and psychopathy, as measured by the Psychopathy Checklist (Hare, 1970)--have been strong predictors of recidivism in sex offenders"); W. Winsalade, T. Stone, M. Smith-Bell & D. Webb, Castrating Pedophiles Convicted of Sex Offenses Against Children: New Treatment or Old Punishment, 51 SMU L. Rev. 349, 361 n.62 (January-February 1998), citing D. Laws, Direct Monitoring by Penile Plethysmography, in Relapse Prevention with Sex Offenders 105-06 (D. Laws ed., 1989) ("[M]any researchers and clinicians believe that erectile response is a highly powerful measure for

assessing and treating sexual disorders, especially when used in conjunction with other assessment tools. [Citation.] In fact, penile plethysmography may 'equal or exceed' the psychometric properties of more traditional measurement techniques, and is thought to be an essential component of an effective sex offender treatment program. [Citation.] This is because penile plethysmography is able to measure a core element of deviant sexual orientation, deviant sexual fantasy and arousal, that may otherwise not be effectively addressed by a particular treatment program"); J. Peters-Baker, Challenging Traditional Notion of Managing Sex Offenders: Prognosis is Lifetime Management, 66 UMKC L. Rev. 629, 664 (1998) ("Although the results of this test may be unreliable for proving guilt, the results prove much more useful in a community setting to monitor treatment of the offender"); R. Wettstein, A Psychiatric Perspective on Washington's Sexually Violent Predators Statute, 15 U. Puget Sound L. Rev. 597, 610 (1992) (recommending plethysmography as a component of evaluations of sex offenders); see also Sentencing Sex Offenders, 159 Practicing Law Institute, Criminal Law & Urban Problems 669, 672 (1991). Thus, PPG testing is endorsed by a substantial number of experts who work with sex offenders. Some go so far as to state that it is the strongest or best indicator of a propensity for sexual violence or recidivism. See C. Mee & H. Hall, Risky Business: Assessing Dangerousness in Hawaii, 24 U. Haw. L. Rev. 63, 105 n.227 (2001); R. Hamill, Recidivism of Sex Offenders: What You Need to Know, 15 Criminal Justice 24 (ABA 2001). Others simply acknowledge that the device is useful in the evaluation of sex offenders and that it provides data relevant to the question of recidivism. See R. Schopp, M. Scalora & M. Pearce, Expert Testimony and Professional Judgment: Psychological Expertise and

<u>Commitment as a Sexual Predator after Hendricks</u>, 5 Psychol. Pub. Pol'y & L. 120, 135 (1999).  In sum, we find ample support in the academic literature to conclude that PPG testing is accepted by a substantial number of experts in this field such that it may be used to support a qualitative assessment of the future dangerousness of an individual.

The State has called our attention to a number of Internet sources that document the use of PPG testing for the treatment of sex offenders.  See Pennsylvania Sex Offender Assessment Board, "Sexually Violent Predator Treatment and Management Standards," at 5 (June 16, 2004), <u>available at</u> http://www.meganslaw.state.pa.us/soab/lib/soab/SVP_Treatment_Provider_Standards.doc ("The program shall have the capacity to provide for the administration of objective measures such as the Abel Sexual Interest Inventory or Plethysmography to ascertain deviant sexual interest and arousal patterns"); Colorado Sex Offender Management Board, "Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders," at 22 (June 2000), <u>available at</u> http://www.csom.org/train/treatment/long/05/docs/material/Costandards.pdf. The State has also submitted a Colorado Department of Corrections report that was the product of a survey of sex-offender treatment and management programs throughout the country, which documents the use of PPG testing in several states.  See Colorado Department of Corrections, "State Sex Offender Treatment Programs," at 7, 39, 71, 98, 116, 142, 330, 342, 379, 402 (August 2000), <u>available at</u> http://www.doc.state.co.us/admin_reg/PDFs/SO-report-send2.pdf.    We set forth this

material here solely to further show that the use of PPG testing is widely used in this country, just as we did with case law when we started this analysis.

Finally, we note that PPG testing has received some recognition in this state. In a section of the Administrative Code entitled "Elements of Comprehensive Sex Offense Specific Evaluations," PPG testing is listed three times as a possible component of a pre-sentence evaluation. 20 Ill. Adm. Code §1905.240 (2006) (amending 29 Ill. 12273 (eff. July 25, 2005)). In one Illinois case, an expert witness for the State (Heaton, in fact) "acknowledged an article written by Drs. Hanson and Bussiere in which they wrote that the penile plethysmograph test, which measures a person's sexual arousal to various stimuli, is the strongest predictor of recidivism among the meta-analysis factors." In re Commitment of Field, 349 Ill. App. 3d 830, 835 (2004).

The materials set forth above overwhelmingly demonstrate that PPG testing is widely used in the treatment and screening of sex offenders. Obviously, if those who treat sex offenders use this technology, they accept it. In this state, general acceptance under Frye requires only that a substantial number of experts, rather than a majority, accept the methodology in question. (Simons, 213 Ill. 2d at 530). We are cognizant that others have criticized and rejected PPG testing. See, e.g., Spencer, 119 N.C. App. at 666, 459 S.E.2d at 815; J. Odeshoo, Of Penology and Perversity: The Use of Penile Plethysmography on Convicted Child Sex Offenders, 14 Temp. Pol. & Civ. Rts. L. Rev. 1 (2004); B. Bahroo, Pedophilia Psychiatric Insights, 41 Family Court Review 497 (2003); S. Brakel & J. Cavanaugh, Of Psychopaths and Pendulums: Legal and Psychiatric Treatment of Sex Offenders in the United States, 30 N.M. L. Rev. 69, 90 (2000) ("But, there is enough

empirical evidence out there to raise real doubt that clinical, actuarial, plethysmographic, polygraphic or visual reactive testing (the Abel Screen), either singly, or in combination, can, in general, yield the degree of certainty about the matter at issue required by the law"). However, since our inquiry concerns neither validity, reliability, nor whether a majority of experts accept PPG testing, the existence of authority to the contrary is not dispositive. A great number of people could disagree with those who accept any given methodology, yet those who accept it could still constitute a significant subset of experts in any given field. This is one such case.

To conclude, since there is a logical, plausible, common-sense connection between sexual arousal and penile engorgement, experts who rely upon the PPG test, which purports to measure this connection, are being reasonable within the meaning of Frye. Moreover, since the test is widely used, it is apparent that it is accepted by a substantial number of those who work with sex offenders, though it is far from clear that this group constitutes a majority. Some of these experts consider it the best tool for assessing recidivism. These two factors satisfy the Frye test as articulated by the Illinois Supreme Court. See Simons, 213 Ill. 2d at 532.

Finally, we will conclude this section with a few additional observations. First, we note that some cases draw a distinction between treatment and prediction. Parker, 971 P.2d at 499 n.6. We find this distinction artificial. If an expert believes that he or she can garner information from a PPG test to an extent that it is useful in treating a sex offender, this indicates that the expert believes the test yields satisfactory information and thus that the expert accepts the utility of the test. Furthermore, we observe that an individual's

treatment is relevant to the decision as to whether that person is fit to be conditionally released under section 60(d) of the Act (725 ILCS 207/60(d) (West 2002)). That determination turns on whether a person has "made sufficient progress to be conditionally released." 725 ILCS 207/60(d) (West 2002). Of course, what a person is "making sufficient progress" in is treatment. Also, section 60(d) requires a trial court to consider "the person's mental history and present medical condition." 725 ILCS 207/60(d) (West 2002). The treatment an individual has undergone would also appear relevant to the person's present mental condition. Hence, we believe that those courts and experts who find PPG testing useful for treatment provide general support for the proposition that PPG testing satisfies <u>Frye</u>. This may not be the case regarding alternate uses of any given methodology, but, in this case, we believe that the two uses are sufficiently analogous such that the use of PPG testing for treatment is probative of its value for the qualitative assessment of future dangerousness.

Second, we emphasize that the sole question presented to us is whether, insofar as <u>Frye</u> is concerned, an expert may consider PPG testing in forming a qualitative opinion about the likelihood of recidivism of a sex offender. In this case, petitioner's primary argument is that Heaton's opinion should have been disregarded because it relied on such testing. As petitioner points out, Heaton did not testify about the results of any PPG testing; however, results do appear in a written report. We are expressly not presented with, and do not consider, any other questions, such as whether presenting the results of a PPG test directly to the trier of fact would be properly excluded because the prejudicial effect of such evidence would substantially exceed its probative value. Cf. <u>People v. Gard</u>,

158 Ill. 2d 191, 201 (1994) ("Because the results of polygraph examinations appear to be quasi-scientific, jurors are likely to give such results undue weight. [Citation.] As a consequence, the prejudicial effects of polygraph evidence substantially outweigh its probative value"). In this case, we simply hold that an expert may rely on PPG testing. Further questions about the reliability of the procedure are matters that can be explored at trial. See In re A.V., 849 S.W.2d 393, 398 (Tex. Ct. App. 1993) ("We find the reliability of a penile plethysmograph is relevant to the weight to be given the conclusions in Dr. Powitzky's report, and to Brogden's interpretation of the test" (emphasis in original)).

Third, we note that, though the main focus of petitioner's attack upon Heaton's opinion concerns its reliance upon polygraph and PPG testing, petitioner also briefly contends that it is flawed because Heaton only reviewed reports and records rather than conducting actual interviews with petitioner. Such considerations are relevant to Heaton's credibility as well as the weight to which his opinion was entitled rather than its admissibility. Such matters, typically, are for the trier of fact. People v. Jackson, 358 Ill. App. 3d 927, 941 (2005). Accordingly, we find no error in the trial court's decision to rely on Heaton's opinion.

## B. The Trial Court's Decision

Petitioner also contends that the trial court's factual determination that petitioner had "not made sufficient progress to be conditionally released" (725 ILCS 207/60(d) (West 2002)) is contrary to the manifest weight of the evidence. Under section 60(d) of the Act, the State must prove, by clear and convincing evidence, that the individual petitioning for conditional release is not entitled to that relief. 725 ILCS 207/60(d) (West 2002). The

parties do not agree as to the appropriate standard of appellate review, and no case law exists directly addressing this issue.

Petitioner proposes the manifest-weight standard. He asserts that In re Bates, 315 Ill. App. 3d 736 (2000), is analogous. Bates involved a petition for discharge brought by a person committed pursuant to the Mental Health and Developmental Disabilities Code (405 ILCS 5/1--100 et seq. (West 1998)). In such a proceeding, if the petitioner establishes a prima facie case that he or she is entitled to discharge, the State bears the burden of proving, by clear and convincing evidence, that the petition should be denied. In re Katz, 267 Ill. App. 3d 692, 695 (1994). Courts of review apply the manifest-weight standard to the rulings of trial courts on these petitions. Bates, 315 Ill. App. 3d at 740.

The State, on the other hand, suggests that we treat petitioner's argument as a challenge to the sufficiency of the evidence and conduct review much as we would following a criminal trial. That is, the State contends that we should view the evidence in the light most favorable to it and determine whether any rational trier of fact could have found the essential elements of the cause of action. See People v. Clay, 363 Ill. App. 3d 780, 788 (2006). This standard is applied in reviewing appeals where a person is initially committed under the Act. See In re Tittlebach, 324 Ill. App. 3d 6, 11 (2001). However, the underlying proceeding in those cases requires the State to prove beyond a reasonable doubt that the respondent is a sexually violent person. See 725 ILCS 207/35 (West 2004).

We agree with petitioner. We believe that these determinations should be reviewed using the same standard that applies under the Mental Health and Developmental Disabilities Code (405 ILCS 5/1--100 et seq. (West 1998)), as it is most analogous to the

issue before us. Therefore, we will apply the manifest-weight standard here. Cf. Bates, 315 Ill. App. 3d at 740. A decision is contrary to the manifest weight of the evidence only if an opposite conclusion is clearly apparent. Terminal-Hudson of Illinois, Inc. v. Goldblatt Brothers, Inc., 51 Ill. App. 3d 199, 206 (1977).

Having resolved this preliminary issue, we conclude that the trial court's decision was not against the manifest weight of the evidence. Petitioner raises two points at the beginning of his argument that we find to be of little relevance to our analysis of this issue. First, petitioner asserts that we have "the benefit of evaluating the most recent hearing held below in light of the earlier hearing which resulted in [petitioner's] commitment to the Department of Human Services as a Sexually Violent Person." Some particular fact useful to our inquiry may have been presented in that hearing, such as a fact relevant to "the nature and circumstances of the behavior that was the basis of the allegation" that led to petitioner's commitment (725 ILCS 207/60(d) (West 2002)). However, the question here is not how much progress petitioner has made since he was committed; rather, it is whether petitioner has made sufficient progress to warrant release from a secure setting. Second, petitioner criticizes the Department of Corrections for its failure to provide any significant services while he was incarcerated--a point with which the trial court apparently agreed. The instant case is not a suit regarding the conditions of petitioner's confinement; he does not seek an injunction, mandamus, or some other remedy directing the State to provide him with appropriate treatment. Instead, we are solely concerned with whether petitioner is fit to be conditionally discharged.

Petitioner correctly points out that since he started treatment in the Joliet facility, he has demonstrated a "marked turnaround." Indeed, the trial court recognized this, stating, "This record shows that progress toward a conditional release has been made and I might add that it's significant progress." However, the court also found that, though "substantial strides towards lowering the risk of re-offending" had been made, "there is work that is yet to be done." At the heart of the trial court's ruling was its finding that Heaton "is the most credible on the question of degree of progress in the course of treatment to a point in which conditional release would be appropriate."

Petitioner contends that the trial court should have instead accepted the testimony of Witherspoon. Petitioner points out that Witherspoon had examined him a number of times, and, unlike Heaton, had conducted a personal interview with petitioner (this latter statement does not appear to be entirely accurate, as petitioner agreed to a clinical interview with Heaton in June 2004). Petitioner further asserts that Witherspoon was more credible because he avoided the use of actuarial instruments that, according to petitioner, are controversial even though now admissible. Conversely, Heaton relied on polygraph testing, PPG testing, and actuarial risk assessment. Given our decision in this case and the supreme court's opinion in Simons, the reliance upon the latter two methodologies provides no reason to discount Heaton's opinion outright. Additionally, the trial court made clear that it placed no weight on polygraph testing when it rendered its opinion, and it surely could separate any portion of Heaton's opinion that it found questionable because of any such reliance.

According to petitioner, Heaton "seemed primarily concerned with [petitioner's] recent admissions to having engaged in numerous acts of sexual misconduct in the past which had not previously been revealed." Petitioner continues that "Witherspoon did not find the number of sexual incidents the petitioner had perpetrated before his commitment as relevant as his current level of functioning." (Emphasis in original.) We note that Witherspoon's testimony on this point did not directly contradict Heaton's testimony. Witherspoon's testimony was concerned with the existence of prior acts of sexual misconduct; Heaton was concerned about the belated revelation of these acts of misconduct. Heaton's concern is consistent with his desire that petitioner "show that he has dealt effectively with the full extent of his offense history." To the extent that Witherspoon disagreed with Heaton that dealing with such issues was important, a conflict in the evidence was created.

However, that conflict, as well as the other points upon which petitioner bases his argument, was presented to the trial court. It is, of course, the role of the trier of fact--in this case, the trial court--"to resolve conflicting testimony by assessing the credibility of the witnesses and determine the weight to be accorded their testimony." In re Marriage of Murphy, 359 Ill. App. 3d 289, 302 (2005). Where factual findings are based upon credibility determinations, a reviewing court will generally defer to the trial court. People v. A Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois, 217 Ill. 2d 481, 507 (2005). This is because the trial court, by virtue of its ability to actually observe the conduct and demeanor of witnesses, is in the best position to assess their credibility. In re Edward T., 343 Ill. App. 3d 778, 795 (2003). The trial court

heard Heaton's testimony firsthand and found it persuasive. Petitioner's criticisms of Heaton go to Heaton's credibility and the weight to which his testimony was entitled. Petitioner presents no compelling reason for us to reweigh this evidence and substitute our judgment for that of the trial court. Since the trial court did not err in accepting Heaton's testimony, there is ample, albeit conflicting, evidence in the record to support its decision. Quite simply, an opposite conclusion is not clearly apparent.

## III. CONCLUSION

In light of the foregoing, the judgment of the circuit court of Jo Daviess County is affirmed.

Affirmed.

McLAREN and KAPALA, JJ., concur.