# Illinois Official Reports

## Appellate Court

***In re Commitment of Walker*, 2014 IL App (2d) 130372**

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF FRANKIE N. WALKER, SR. (The People of the State of Illinois, Petitioner-Appellee, v. Frankie N. Walker, Sr., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-13-0372 |
| Filed | September 26, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Respondent's commitment to a secure facility as a sexually dangerous person was upheld, since there was no basis for respondent's contention that *Apprendi* should be extended to civil matters such as his commitment proceedings, his facial challenge to the constitutionality of section 40 of the Sexually Violent Persons Commitment Act on various grounds was rejected, the requirement that respondent be a "sexually violent person" was previously established and did not have to be revisited in the dispositional proceedings, respondent's contention that the trial court erred in allowing his stipulation to his condition was unpersuasive, and the appellate court rejected respondent's contention that a *Frye* hearing should have been conducted on the diagnosis of respondent's condition made by one of the State's physicians. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 07-MR-152; the Hon. Victoria A. Rossetti, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Eric F. Rinehart, of Malia & Rinehart, of Waukegan, for appellant.

Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Michael M. Glick and Katherine M. Doersch, Assistant Attorneys General, of counsel), for the People.

Panel

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices Schostok and Spence concurred in the judgment and opinion.

## OPINION

¶ 1   Respondent, Frankie N. Walker, Sr., was adjudicated a sexually violent person (SVP) and committed to confinement in a secure facility. He now appeals, raising a number of issues regarding the authority of the trial court and the conduct of the proceedings below. For the reasons that follow, we affirm.

¶ 2                                 I. BACKGROUND

¶ 3   In February 2007, the State filed a petition seeking respondent's commitment in accordance with the Sexually Violent Persons Commitment Act (Act or SVPA) (725 ILCS 207/1 *et seq.* (West 2006)). The petition alleged that defendant had pleaded guilty to the offense of attempted predatory criminal sexual assault of a child. It also alleged that respondent had been diagnosed by Dr. Ray Quackenbush with paraphilia, not otherwise specified (NOS), nonconsent, which it described as "a congenital or acquired condition affecting [respondent's] emotional or volitional capacity, which predisposes [respondent] to commit acts of sexual violence." It continued, "Respondent is dangerous because this mental disorder makes it substantially probable that he will engage in acts of sexual violence." Quackenbush's report was attached to the petition. Following a hearing, the trial court found that there was probable cause to believe that respondent is a sexually violent person within the meaning of section 5(f) of the Act (725 ILCS 207/5(f) (West 2006) (" 'Sexually violent person' means a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.")). In April 2007, pursuant to respondent's request, the trial court appointed Dr. Ronald Baron as respondent's expert. Respondent was also examined by Dr. Raymond Wood on behalf of the State.

¶ 4   On July 8, 2008, the parties entered into a stipulation. Before accepting the stipulation, the trial court addressed respondent:

"THE COURT: Before we go forward with [the stipulation], Mr. Walker, have you gone over all of this with [your attorney]?

[RESPONDENT]: Yes.

THE COURT: Do you have any other questions or issues you need to go over with him?

[RESPONDENT]: No.

THE COURT: Do you understand that you do have the right to a jury trial. Your trial could be either in front of a Judge or in front of a jury. You understand that?

[RESPONDENT]: Yes.

THE COURT: Do you have any other questions about that that you need to go over with [your attorney]?

[RESPONDENT]: About the trial? No, ma'am.

THE COURT: You understand that at the trial the State would bring in their witnesses who would testify. You understand that?

[RESPONDENT]: Yes, I do.

THE COURT: [Your attorney] would have the ability to cross-examine or question them. You understand that?

[RESPONDENT]: Yes.

THE COURT: You could bring in witnesses.

[RESPONDENT]: Okay.

THE COURT: You could testify if you wanted to. Do you understand that?

[RESPONDENT]: Yes, I do.

THE COURT: After going over this with [your attorney] again this is what you choose to do?

[RESPONDENT]: I do.

THE COURT: Has anybody forced you or threatened you to get you to do this?

[RESPONDENT]: No, ma'am.

THE COURT: Have you been promised anything?

[RESPONDENT]: No."

The State then went over what Quackenbush and Wood would testify to. The trial court again addressed respondent:

"THE COURT: Mr. Walker, you have gone over that stipulation with [your attorney]?

[RESPONDENT]: Yes.

THE COURT: You understand what was presented this morning?

[RESPONDENT]: Yes, I do."

After the stipulation was presented, the trial court stated, "[B]ased on the stipulation the Court will find that you are a sexually violent person."

¶ 5        The stipulation provided:

(1) "that [t]his Stipulation and Agreement is entered into by the Respondent freely and voluntarily and after consulting with his attorney,"

- 3 -

(2) "that the Respondent has read and understands the allegations and request for relief contained in the Petition for Sexually Violent Person Commitment filed herein,"

(3) "that Respondent understands that he has the right to deny the Petition or to admit to the Petition,"

(4) "that Respondent waives the right to have a mental health professional present evidence at trial,"

(5) "that Respondent waives his right to a trial by a jury or by a judge,"

(6) "that Respondent waives his right to present evidence at trial,"

(7) "that the Respondent waives his right to have the People prove that he is a sexually violent person beyond a reasonable doubt,"

(8) "that Respondent has been adjudicated delinquent of the sexually violent offense of Attempt Predatory Criminal Sexual Assault of a Child in Lake County, Illinois, in 2002, in case number 02 CF 448,"

(9) "that if this case was to proceed to trial, the People would call Dr. Ray Quackenbush and Dr. Ray Wood to testify,"

(10) "that Dr. Quackenbush and Dr. Wood are experts in clinical psychology in the evaluation and treatment of sex offenders,"

(11) "that if Drs. Quackenbush and Wood were called to testify at trial, they would testify to facts and information as contained in their evaluation reports dated January 31, 2007 (Dr. Quackenbush) and May 25, 2007 (Dr. Wood), and previously filed in this cause, attached as Exhibits A and B,"

(12) "that if Drs. Quackenbush and Wood were called to testify at trial, they would testify that based on their experience, education, training, review of Respondent's records and their interviews of the Respondent, it is their opinion, within a reasonable degree of psychological certainty, that the Respondent suffers from the mental disorders of Paraphilia, Not Otherwise Specified, Nonconsent (Dr. Quackenbush) and Paraphilia, Not Otherwise Specified, Sexually Attracted to Non-Consenting Females, Nonexclusive type and Pedophilia, Sexually Attracted to Females, Nonexclusive Type (Dr. Wood). Drs. Quackenbush and Wood would also testify that these mental disorders are congenital or acquired conditions that seriously affect the Respondent's emotional or volitional capacity and predispose him to engage in acts of sexual violence. Drs. Quackenbush and Wood would also testify that these mental disorders cause Respondent serious difficulty in controlling his behavior. Drs. Quackenbush and Wood would also testify that Respondent is dangerous because his mental disorders make it substantially probable that Respondent will engage in future acts of sexual violence,"

(13) "that the Respondent is a sexually violent person,"

(14) "that Respondent has the right to a predispositional report and the right to a dispositional hearing," and

(15) "that the Respondent is committed to the custody of the Department of Human Services for control, care and treatment in a secure setting until his dispositional hearing."

Both respondent and his attorney personally signed the stipulation. The trial court also entered an agreed order on that date. The order found that respondent's attorney read to respondent–and that respondent understood–the allegations against him; that he understood that he could be committed to the custody of the Illinois Department of Human Services (DHS) until he is no longer a sexually violent person; that respondent's attorney read to respondent–and that respondent understood–the stipulation; and that respondent is a sexually violent person. The court committed respondent to the custody of DHS. In September 2008, the court appointed Dr. Kirk Witherspoon to serve as respondent's expert. Respondent received Witherspoon's report on March 31, 2009.

¶ 6    On that same day, respondent moved to withdraw the stipulation. Respondent alleged that his decision to enter into the stipulation was based on the reports by Quackenbush and Wood. However, respondent alleged, there were several problems with the bases for their opinions. The trial court denied the motion. The trial court ruled, *inter alia*, that the mere fact that respondent found Witherspoon's report more favorable did not amount to a showing of good cause to withdraw the stipulation.

¶ 7    On July 16, 2009, respondent moved to proceed *pro se*. The trial court granted the motion. Respondent then moved the court to reconsider its denial of his motion to withdraw the stipulation. Respondent also sought the appointment of standby counsel. Both motions were denied. Respondent filed additional motions attacking the stipulation, all of which were denied. Respondent also unsuccessfully raised the issue of the effectiveness of the representation he had received.

¶ 8    A dispositional hearing was held over two dates in March 2013. At the beginning of the hearing, respondent informed the trial court that he was not prepared to proceed. The trial court noted that respondent had "filed the exact same motions since 2007 on the road towards the dispositional hearing." It then ruled that the hearing would proceed.

¶ 9    The State called Wood, a clinical psychologist. Wood testified to his credentials, and the trial court recognized him as an expert in the field of "clinical and forensic psychology, specifically in the area of sexually violent persons' evaluations, diagnosis and risk assessment and treatment." Respondent answered negatively when the trial court asked him if he had any objection. Wood examined respondent "relative to potential commitment as a sexually violent person." Wood interviewed respondent in 2007 and 2008; however, respondent declined to participate in a 2009 interview.

¶ 10   Wood testified that respondent had committed sexually violent offenses. The predicate offense to the instant petition involved the "eight-year-old daughter of his wife." The victim reported being assaulted on two or three occasions in February 2002. Respondent pleaded guilty to attempted predatory criminal sexual assault of a child and received an 11-year sentence. Respondent told Wood that his motivation for the assaults was "to seek some measure of revenge because he believed his wife had been unfaithful." While respondent felt some justification for the assaults, he also felt some remorse.

¶ 11   Wood testified that in 1990, when respondent was 21 years old, he raped an 18-year-old woman. He followed her off a bus to a dark area where he threatened her and sexually assaulted her. He was convicted and served an eight-year prison sentence. Wood stated that respondent had been arrested for 21 other offenses, including robbery, domestic abuse, batteries, and violations of restraining orders.

¶ 12    Wood diagnosed respondent with paraphilia, NOS, sexually attracted to nonconsenting females, nonexclusive type. He also diagnosed respondent with pedophilia, sexually attracted to females, nonexclusive type. He further diagnosed alcohol dependence, cannabis and cocaine abuse (Wood stated that he was not certain if it was abuse or dependence), and antisocial personality disorder with narcissistic features. Wood noted that respondent was known to have engaged in "nonconsensual sexual conduct" on two occasions. Moreover, when assessed during his most recent incarceration, "there was evidence of arousal to coercive sexual contact." Additionally, "[t]here was also evidence of sexual arousal to grammar- and adolescent-age females." Wood further explained that alcohol use diminishes inhibitions and that antisocial personality disorder involves a lack of concern for the rights and welfare of others; both conditions increase "the predisposition to *** deviant paraphilic acts."

¶ 13    At the detention facility, Wood explained, treatment could involve up to 10 sessions per week, consisting of up to 21 hours per week (during cross-examination, Wood acknowledged that only 15 of these hours would be sex-offender-specific treatment). There are also "ancillary" or "offense related" treatments available to residents. Conversely, treatment for individuals on conditional release typically consisted of two sessions per week of an hour-and-a-half each. Wood opined that respondent needed the "intense" treatment available only at the detention facility. In Wood's opinion, outpatient treatment would be inadequate. During cross-examination, respondent attacked the bases of Wood's opinions as well as their timeliness. Following Wood's testimony the State rested. Respondent presented no witnesses.

¶ 14    The trial court noted that it had to consider three factors in accordance with section 40 of the Act (725 ILCS 207/40 (West 2006)), specifically, the nature and circumstances of the predicate behavior alleged in the SVP petition; respondent's mental history and his present mental condition; and the arrangements available to ensure that respondent has access to and will participate in treatment he needs. As to the first consideration, the trial court observed that respondent pleaded guilty to attempted predatory criminal sexual assault in 2002 and that in 1990 he was convicted of aggravated criminal sexual assault. Regarding the second factor, the court noted Wood's diagnoses of paraphilia, pedophilia, alcohol abuse, and antisocial personality disorder. On the third factor, the trial court noted the difference in the amount of treatment available in a secured facility as opposed to while on conditional release as well as the fact that respondent had not participated in treatment during the 6½ years he had been detained leading up to the dispositional hearing. Hence, the trial court found that respondent was in need of intensive treatment and that the least restrictive environment in which respondent could receive such treatment was secure detention. This appeal followed.

¶ 15                                    II. ANALYSIS

¶ 16    Respondent raises a number of issues on appeal. First, he contends that section 40 of the Act (725 ILCS 207/40 (West 2006)) is unconstitutional because it does not allow him to demand that factual issues be resolved by a jury and because it permits detention on proof less than beyond a reasonable doubt. Second, respondent asserts that a finding that confinement was necessary to prevent him from committing sex offenses in the future, which the trial court did not make, was required before he could be detained. Third, he argues that the trial court should not have accepted his stipulation, because no provision of the Act

- 6 -

authorizes such a procedure. Fourth, he claims that the trial court took inadequate steps to ensure that he understood the consequences of the stipulation. Fifth, he argues that he received ineffective assistance of counsel when his attorney permitted him to enter into the stipulation. Sixth, he protests the trial court's failure to hold a *Krankel* hearing (see *People v. Krankel*, 102 Ill. 2d 181, 189 (1984)). Seventh, respondent alleges that the trial court should have held a "meaningful evidentiary hearing" on his motion to withdraw his stipulation. Eighth, he asserts that the trial court should have held a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) regarding certain methodologies employed by Wood. We will address these issues in the order raised by respondent.

¶ 17                    A. CONSTITUTIONALITY OF SECTION 40 OF THE ACT

¶ 18        Respondent first claims that section 40 of the Act (725 ILCS 207/40 (West 2006)) is unconstitutional. The constitutionality of a statute is an issue we review *de novo*. *People v. Malchow*, 193 Ill. 2d 413, 418 (2000). Any doubts are to be resolved in favor of upholding the validity of the statute. *People v. Jamesson*, 329 Ill. App. 3d 446, 452 (2002). Respondent first argues that factual issues should have been decided by a jury. He also asserts that the reasonable-doubt standard should apply in these proceedings. We find neither contention persuasive.

¶ 19        Respondent's argument regarding a jury-trial right attaching to such proceedings rests entirely on *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Apprendi*, of course, was a criminal case. *Id*. Proceedings under the Act are civil. 725 ILCS 270/20 (West 2006). Respondent cites no case applying *Apprendi*'s rule in a civil proceeding. In *People v. Wagener*, 196 Ill. 2d 269, 287 (2001), our supreme court adopted a narrow interpretation of *Apprendi*'s reach, refusing to extend it to cover consecutive sentences:

> "We are bound to follow the United States Supreme Court's interpretation of the Constitution of the United States. [Citations.] But we are not bound to extend the decisions of the Court to arenas which it did not purport to address ***."

Hence, absent some compelling authority justifying such an extension, none of which has been called to our attention, we cannot simply disregard the supreme court's admonishment and extend *Apprendi* to civil proceedings.

¶ 20        We turn now to respondent's contention that the reasonable-doubt standard should apply to proceedings under section 40 of the Act. Indeed, he contends that the section is unconstitutional because it fails to specify who bears the burden of proof and what that burden is. Statutes are presumed constitutional, and the party challenging the statute bears the burden of establishing its unconstitutionality. *People v. Aguilar*, 2013 IL 112116, ¶ 15. Moreover, a court has a duty to construe a statute in a way that upholds its validity and constitutionality, if that can reasonably be done. *Id*.

¶ 21        Constitutional challenges come in two varieties: facial and as applied. See *People v. Normand*, 345 Ill. App. 3d 736, 739 (2004). To succeed on an as-applied challenge, a party need show only that the statute is unconstitutional as it is enforced upon him or her. See *Vuagniaux v. Department of Professional Regulation*, 208 Ill. 2d 173, 191 (2003). Facial challenges are more difficult. *Tomm's Redemption, Inc. v. Hamer*, 2014 IL App (1st) 131005, ¶ 2. Mounting a successful facial challenge requires that a party demonstrate that there are no circumstances under which the statute could be constitutionally applied. *Jackson v. City of*

*Chicago*, 2012 IL App (1st) 111044, ¶ 25. A successful facial challenge voids a statute in all contexts for all parties. *Id*. Where a statute is challenged on its face, the facts of a party's particular case are irrelevant. *Id*. ¶ 27.

¶ 22     Respondent's challenge is clearly facial. He asserts that section 40 is fatally, constitutionally flawed because it does not specify a burden of proof and that, constitutionally, it should require proof beyond a reasonable doubt. While it is true that the trial court did not specify what burden of proof it was applying, we note that the trial court made an affirmative finding that respondent "is in need of intensive treatment and the least restrictive facility for treatment is in secured detention." Thus, it is apparent that the trial court based its decision on the State's presentation of evidence rather than respondent's failure to prove that detention was not appropriate. As such, the burden of proof was clearly on the State. Moreover, that the trial court did not identify what burden of proof it was using would not typically be a basis to disturb its decision. Trial judges are presumed to know the law. *People v. Koch*, 248 Ill. App. 3d 584, 591 (1993). Absent some indication in the record to the contrary, we presume that the judge applied the law correctly. *People v. Blair*, 215 Ill. 2d 427, 449 (2005). Assuming, *arguendo*, that respondent is correct that the reasonable-doubt standard applies, respondent points to nothing in the record that would suggest that the trial court did not apply it, so an as-applied challenge would necessarily fail. In any event, as respondent's challenge is facial, the conduct of the dispositional hearing in this case is beside the point.

¶ 23     Instead, we must consider whether section 40 is constitutionally sound. That is, we must consider whether a set of circumstances exists under which the law could be constitutionally applied. *Jackson*, 2012 IL App (1st) 111044, ¶ 25. Respondent relies on *People v. Pembrock*, 62 Ill. 2d 317 (1976), and *People v. Trainor*, 196 Ill. 2d 318 (2001), in support of his argument. Both cases concern versions of the Sexually Dangerous Persons Act (SDPA) (Ill. Rev. Stat. 1971, ch. 38, ¶ 105-1.01 *et seq.*; 725 ILCS 205/1.01 *et seq.* (West 1998)). There are differences between the SDPA and the SVPA. See *People v. Runge*, 346 Ill. App. 3d 500, 509 (2004) ("A person committed to DHS or awaiting commitment under the Sexually Violent Persons Act has been previously convicted of a sexually violent offense or found not guilty of such offense by reason of insanity. [Citation.] In this respect, such persons are not similarly situated to persons committed under the Sexually Dangerous Persons Act [citation], who have been charged but not convicted, or to other residents of DHS, whose involuntary commitment does not follow a criminal conviction for a sexually violent offense."). Nevertheless, the acts are sufficiently similar such that the cases cited by respondent provide us with some guidance. We will therefore assume–for the sake of argument–that due process requires the application of the reasonable-doubt standard in proceedings under section 40.

¶ 24     However, nothing in section 40 precludes the application of that standard. Assuming that respondent is correct that these cases require the use of the reasonable-doubt standard in proceedings under section 40, there is no reason that the trial court could not rely upon them and apply that standard to such proceedings. In *People v. Boand*, 362 Ill. App. 3d 106, 141 (2005), the defendant argued that "the drug-induced-homicide statute [was] unconstitutionally vague because it does not specify what mental state subjects an accused to criminal liability." The *Boand* court rejected the constitutional challenge, explaining that "the drug-induced-homicide statute incorporates the 'knowing' mental state element from section 401 of the [Illinois Controlled Substances] Act." *Id*. at 142. Thus, it is apparent that a court

may look beyond the four corners of a statute in assessing its constitutionality. This is particularly true where, as here, nothing in the statute precludes looking to relevant case law or contradicts the substance of those cases. See *People v. Masterson*, 207 Ill. 2d 305, 329 (2003) (holding that portions of the SVPA should be "read into" the SDPA to cure potential constitutional problem); see also *People v. Burgess*, 176 Ill. 2d 289, 315 (1997) ("A limiting construction may save a statutory aggravating circumstance that must otherwise be considered unconstitutionally vague under the eighth amendment."); *People v. Hill*, 333 Ill. App. 3d 783, 786 (2002) ("A statute regulating conduct is overbroad if it (1) criminalizes a substantial amount of protected behavior, relative to the law's plainly legitimate sweep; and (2) is not susceptible to a limiting construction that avoids constitutional problems."). In sum, nothing in section 40 prevents a trial court from applying the reasonable-doubt standard (assuming it applies) and respondent has failed to show that the section is incapable of constitutional application. Accordingly, his facial challenge to its constitutionality fails.

¶ 25                    B. FINDING OF FUTURE DANGEROUSNESS

¶ 26    Respondent argues that, in accordance with the supreme court's decision in *Masterson*, a prerequisite to secure detention was a finding that it was necessary to prevent him from committing future acts of sexual violence. The State contends that *Masterson* does not apply here. We conclude that the SVPA already incorporates the principles set forth in *Masterson*; as such, it provides no basis for granting any relief to respondent.

¶ 27    Initially, we note that, to the extent that respondent argues that–in addition to the other findings required by the SVPA–*Masterson* requires a separate finding that secure confinement is necessary to prevent him from engaging in future acts of sexual violence, his argument is not well taken. We have already held that a trial court need not select the least restrictive alternative during section 40 proceedings. *In re Commitment of Brown*, 2012 IL App (2d) 110116, ¶ 19 (citing *In re Detection of Lenczycki*, 405 Ill. App. 3d 1041, 1051 (2010) ("Illinois case law also suggests that selecting the 'least restrictive alternative' is a requirement under certain statutes, but it is not a constitutional requirement of due process" (citing *Bernstein v. Department of Human Services*, 392 Ill. App. 3d 875, 888-93 (2009)))). Moreover, we note that respondent's assertion that a finding of sexual dangerousness must occur *during the course of section 40 proceedings* is unsupported by citation to authority. In fact, as we explain below, such a finding must be made at an earlier stage. As such, the SVPA satisfies the requirements imposed by the supreme court in *Masterson*, and that case requires no additional finding regarding the necessity of confinement.

¶ 28    In *Masterson*, the supreme court considered whether the SDPA (725 ILCS 205/1.01 *et seq.* (West 2000)) was constitutional in light of two recent United States Supreme Court decisions (*Kansas v. Hendricks*, 521 U.S. 346 (1997), and *Kansas v. Crane*, 534 U.S. 407 (2002)). The issue, in conformance with this line of cases, was whether the SDPA required a finding that a respondent had "serious difficulty" in controlling his or her behavior. *Masterson*, 207 Ill. 2d at 324.

¶ 29    Our supreme court determined that this act met "minimum constitutional standards":

"The language of the SDPA implies that the mental disorder which afflicts the subject of the commitment proceeding must be causally related to the person's propensity to commit sex offenses, and the requirement that the person has *demonstrated* that propensity by his or her actions is an important indicator of *both* mental abnormality

or disorder and future dangerousness, as *Hendricks* acknowledged. See *Hendricks*, 521 U.S. at 362 \*\*\*. By acting upon their propensities, those suffering from mental disorders demonstrate dangerousness and impaired volitional capacity. Dangerousness and lack of control are the touchstones for civil commitment under *Hendricks*." (Emphases in original.) *Id*. at 328.

It acknowledged, however, that the SDPA suffered from "certain significant ambiguities": "we note that the SDPA, unlike similar statutes in other states and our own SVPA, does not *specifically* address volitional capacity, it fails to define the term 'mental disorder' and it does not provide an explicit standard for gauging the probability or likelihood that the subject of the proceeding will commit sexual offenses in the future." (Emphasis in original.) *Id*. at 328-29. As the SDPA was unclear, it looked to the SVPA for guidance. *Id*. at 329. It held that "the SVPA's definition of 'mental disorder' should be read into the SDPA to the extent consistency allows and augmented with the standard that appears to emerge from *Crane*," and it "construe[d] the term 'mental disorder,' as used in the SDPA, to mean a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in the commission of sex offenses and results in serious difficulty controlling sexual behavior." *Id*. It ultimately concluded that "a finding of sexual dangerousness premised upon the elements of section 1.01 of the SDPA (725 ILCS 205/1.01 (West 2000)) must hereafter be accompanied by an explicit finding that it is 'substantially probable' the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." *Masterson*, 207 Ill. 2d at 330. Put succinctly, the *Masterson* court incorporated the requirement contained in section 5 of the SVPA–that it be substantially probable that a respondent will engage in future acts of sexual violence–into the SDPA's definition of "sexually dangerous person" (see 725 ILCS 205/1.01 (West 2000)).

¶ 30    That is, *Masterson* took a requirement from the SVPA–the act at issue here–and applied it to the SDPA. Respondent now contends that this requirement should be applied to the SVPA. The obvious problem for respondent is that this requirement already applies to the SVPA. It does not, however, apply to the section 40 proceeding.

¶ 31    Section 5 of the Act defines "sexually violent person" as:

"a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2006).

Section 35 provides that "[i]f the court or jury determines that the person \*\*\* is a sexually violent person, the court shall enter a judgment on that finding and shall commit the person as provided under Section 40 of this Act." 725 ILCS 207/35(f) (West 2006). Section 40 provides, in pertinent part, "In determining whether commitment shall be for institutional care in a secure facility or for conditional release, the court shall consider the nature and circumstances of the behavior that was the basis of the allegation in the petition under paragraph (b)(1) of Section 15, the person's mental history and present mental condition, \*\*\* and what arrangements are available to ensure that the person has access to and will participate in necessary treatment." 725 ILCS 207/40(b)(2) (West 2006).

¶ 32    Respondent contends that in the section 40 proceeding the trial court had to find that it is "substantially probable that [he] will engage in acts of sexual violence" (725 ILCS 207/5(f)

(West 2006)) prior to ordering secure confinement. Respondent concedes that he "entered into a stipulation that appears to satisfy sections 5 and 35 of the [SVPA]." Indeed, respondent stipulated that he "waives his right to have the People prove that he is a sexually violent person beyond a reasonable doubt." The substantially-probable criterion is relevant to the determination of whether respondent is a "sexually violent person," as the definition of this term in section 5 makes clear. Moreover, that determination is made in a section 35 proceeding. As such, prior to the dispositional proceeding under section 40, it was already established–via respondent's stipulation–that respondent is a sexually violent person and that it is therefore "substantially probable that [he] will engage in acts of sexual violence." There was no need for the trial court to revisit this issue during the section 40 proceeding.

¶ 33                               C. THE STIPULATION

¶ 34    Respondent next makes two attacks upon the stipulation itself. First, he argues that the stipulation was not authorized by the Act. Second, he contends that the trial court failed to ensure that he understood his rights and what he was doing when he entered into the stipulation.

¶ 35                      1. Whether the Stipulation was Authorized

¶ 36    We find respondent's first contention ill taken. Respondent argues that nothing in the Act authorized the stipulation; therefore, he asserts, the trial court should not have accepted it. Essentially, respondent is arguing that a respondent in proceedings under the Act must be compelled to partake in an evidentiary hearing, even where he or she does not desire one. We cannot infer such a rule from the fact that the Act does not expressly contemplate stipulations. Indeed, respondent points to no authority barring the use of stipulations in proceedings under the Act. As the State points out, stipulations are generally favored, as they promote the efficient disposition of cases, simplify issues, and reduce the expense of litigation. *People v. Woods*, 214 Ill. 2d 455, 468 (2005). Stipulations will be enforced unless unreasonable, procured by fraud, or violative of public policy. *Fitzpatrick v. Human Rights Comm'n*, 267 Ill. App. 3d 386, 390 (1994). Respondent also analogizes his stipulation to a guilty plea; however, as noted, proceedings under the Act are civil. 725 ILCS 270/20 (West 2006); *In re Detention of Samuelson*, 189 Ill. 2d 548, 559 (2000).

¶ 37    Respondent also argues that he should not have been allowed to stipulate to a legal conclusion. Citing *American Pharmaseal v. TEC Systems*, 162 Ill. App. 3d 351, 356 (1987), respondent argues that such stipulations invade the province of the trial court. It is true that, "while parties may bind themselves by stipulation, they 'cannot bind a court by stipulating to a question of law or the legal effect of facts.' " *Id*. (quoting *Domagalski v. Industrial Comm'n*, 97 Ill. 2d 228, 235 (1983)). The problem with the stipulation in *American Pharmaseal* was that, beyond stipulating to the amount of damages, it "direct[ed] the court as to how it must assess the amount of judgment based on those stipulated facts and any comparative fault the jury might attribute to the plaintiff." *Id*. In this case, the parties simply stipulated that respondent was a sexually violent person; they did not attempt to direct the trial court as to how to proceed in light of the stipulation. Indeed, the trial court made its own finding that respondent was a sexually violent person: "[B]ased on the stipulation the Court will find that you are a sexually violent person." As such, the stipulation did not share the

defect that the stipulation in *American Pharmaseal* possessed. Accordingly, that case is distinguishable.

¶ 38    In short, respondent's contention that stipulations cannot be used in proceedings under the Act, because they are not expressly statutorily authorized, is wholly unpersuasive.

¶ 39                                    2. Admonishments

¶ 40    Respondent next contends that the trial court should not have accepted his stipulation without taking steps to ensure that he understood the consequences of the stipulation. Specifically, respondent contends that the trial court should have: (1) taken steps to ensure that he understood "every aspect and implication of his stipulation"; (2) advised him of the rights he was giving up under section 35 (see 725 ILCS 207/35 (West 2006)); (3) advised him of the nature of a hearing under section 40 (see 725 ILCS 207/40 (West 2006)); (4) advised him of his right to move to withdraw the stipulation; and (5) ensured that he understood the evidence against him. We review these issues *de novo*. *People v. DePaolo*, 317 Ill. App. 3d 301, 310 (2000); see also *People v. Saleh*, 2013 IL App (1st) 121195, ¶ 14.

¶ 41    Initially, we note that respondent relies largely upon cases involving guilty pleas. In *People v. Phillips*, 217 Ill. 2d 270, 287 (2005), upon which respondent relies, the supreme court held that, where a stipulation is the functional equivalent of a guilty plea, a trial court must admonish the defendant regarding the implications and consequences of the stipulation. Respondent's reliance on such cases is of dubious value. As we have previously noted, proceedings under the Act are civil. 725 ILCS 207/20 (West 2006); *Samuelson*, 189 Ill. 2d at 559. Moreover, the objective of detention under the Act is treatment, not punishment. *In re Detention of New*, 2013 IL App (1st) 111556, ¶ 58 (citing *In re Lance H.*, 2012 IL App (5th) 110244, ¶ 21); *In re Detention of Cain*, 341 Ill. App. 3d 480, 484 (2003) ("Civil commitment is nonpunitive and lasts only so long as is necessary to address an individual's problems."). Hence, cases involving guilty pleas provide little guidance here. That said, we turn to respondent's first argument.

¶ 42    Respondent first argues that the trial court was obligated to ensure that he had a "full understanding of what he was giving up" and to "ensure [his] understanding of every aspect and implication of the stipulation." This exceeds even what is required of a trial court when it accepts a guilty plea. Quite simply, a trial court need not inform a criminal defendant of every "aspect and implication" of a plea. It is well settled, for example, that a criminal defendant need not be aware of the collateral consequences of a plea. *People v. Williams*, 188 Ill. 2d 365, 371 (1999). Respondent provides us with no basis to impose a *greater* duty on the trial court in the present context.

¶ 43    Next, respondent claims that the trial court should have advised him of the rights he was waiving under section 35. He relies exclusively on cases from the criminal milieu. Respondent asserts that the trial court should have explained to him that the State would have to prove beyond a reasonable doubt each element required by the Act. However, the stipulation signed by respondent stated that he "waives his right to have the People prove that he is a sexually violent person beyond a reasonable doubt." Though the elements were not mentioned here, the stipulation elsewhere stated that respondent "read and understands the allegations and request for relief contained in the Petition for Sexually Violent Person Commitment filed herein." Moreover, the trial court orally inquired of respondent whether he had gone over the stipulation with his attorney and whether he had any further questions.

Thus, the trial court took substantial steps to ensure that respondent understood what he was doing, and we perceive no due process violation here. Respondent cites two criminal cases that require more; nevertheless, we find the procedures employed by the trial court adequate in the instant context. Moreover, we find it of no moment that the trial court did not explain with more detail respondent's right to a jury trial or to call witnesses and that it did not mention the right against self incrimination. Thus, assuming that the trial court was required to give these admonishments, we hold that they were adequate.

¶ 44        Respondent next asserts that the trial court should have admonished him regarding the nature of a section 40 proceeding. Respondent provides no authority for this argument (save a general cite to a criminal case: "*See Phillips*"). As such, we deem it forfeited. *People v. Ward*, 215 Ill. 2d 317, 332 (2005). Having reviewed this argument, we also do not find it persuasive.

¶ 45        Respondent further argues that the trial court should have admonished him about his right to move to withdraw his stipulation. Respondent points out that one of the reasons the trial court cited in denying his motion to withdraw was that it was not timely. He then cites Illinois Supreme Court Rule 605(b) (eff. Oct. 1, 2001), which requires a trial court to admonish a criminal defendant that he or she has 30 days to move to withdraw a guilty plea. Initially, we note that any analogy between Rule 605(b) and this case is dubious in that Rule 605(b) concerns the course of proceedings after judgment is entered, 30 days after which the trial court's jurisdiction will lapse. Here, at issue is a stipulation entered into during the course of ongoing proceedings over which the trial court will continue to retain jurisdiction. Thus, Rule 605(b) provides little support–even by analogy–for the proposition that a trial court must admonish a respondent after the entry of a stipulation as in the present case. Indeed, a respondent might be able to show good cause well after a 30-day period following a stipulation if his or her mental condition has changed. Thus, whether a motion to withdraw is timely is likely dependent on the facts and circumstances of an individual case. Respondent does not elaborate on the merits of the trial court's finding that his motion was untimely. In sum, as it is unclear that such a limitation is appropriate in proceedings like these, we cannot say that the trial court should have admonished respondent in such a fashion.

¶ 46        Respondent finally argues that the trial court should have taken steps to ensure that he fully understood the evidence against him. Notably, the stipulation contained a recitation of what Quackenbush and Wood would testify to. The trial court inquired of respondent whether he had gone over the stipulation with his attorney, understood it, and had any further questions. Respondent never manifested any hesitation or doubt that would indicate that he did not understand what was transpiring. Again, assuming that they were necessary, we hold that the trial court's admonishments were adequate in this context.

¶ 47        Respondent claims that he should have been allowed to review the reports by Quackenbush and Wood. He acknowledges that not even a criminal defendant has a right to review discovery. *People v. Davison*, 292 Ill. App. 3d 981, 988-89 (1997). However, he claims that this case is "closer to the situation in *People v. Smith*, 268 Ill. App. 3d 574 (1994)." Indeed, those two cases are diametrically opposed, as *Smith* concludes that the decision to allow a client to review evidence is a matter of trial strategy and *Davison* holds to the contrary (see also *People v. James*, 362 Ill. App. 3d 250, 258 (2005)). However, neither case provides significant guidance here. Aside from being criminal cases, they both involve

ineffective-assistance- of-counsel claims and thus concern the duties of counsel rather than the court.

¶ 48    To conclude, we reject respondent's allegations that the trial court should have taken additional steps to protect respondent's rights before accepting the stipulation, as the steps it took were more than adequate.

¶ 49                              D. EFFECTIVE ASSISTANCE OF COUNSEL

¶ 50    Respondent next complains of the representation he received in connection with the stipulation. He asserts that allowing him to enter into the stipulation constituted ineffective assistance. To make out a claim of ineffective assistance of counsel, a respondent under the Act must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's unprofessional error. *In re Commitment of Dodge*, 2013 IL App (1st) 113603, ¶ 20. Both prongs must be satisfied. *Id*.

¶ 51    Here, respondent fails to show prejudice. He claims that, but for the stipulation, the trial court could not have conducted the dispositional hearing pursuant to section 40 and that it ended his "chances of engaging in an adversarial process regarding Section 35." This is not prejudice. Quite simply, the opportunity to engage in an adversarial hearing says nothing as to whether the outcome of that hearing would have been different. Respondent points to nothing to establish "a reasonable probability that *** the outcome [of the proceedings] would have been different." *Id*. We therefore reject this argument.

¶ 52    Before proceeding further, we note that respondent contends that he should not be required to show prejudice because his attorney failed to subject the State's case to meaningful adversarial testing. See *People v. Kozlowski*, 266 Ill. App. 3d 595, 601 (1994). Respondent bases this contention entirely on the stipulation; however, we cannot conclude that the mere fact that respondent entered into the stipulation constitutes a failure to engage in adversarial testing of the State's case. Such a holding would imply that any use of such a stipulation–or, for that matter, a guilty plea–would constitute ineffective assistance.

¶ 53                                      E. *KRANKEL* INQUIRY

¶ 54    Respondent contends that the trial court did not make an appropriate inquiry into his claims of ineffective assistance of counsel in accordance with *People v. Krankel*, 102 Ill. 2d 181 (1984). Respondent cites no case applying *Krankel* outside of the criminal realm. At oral argument, respondent argued that the need to hold a *Krankel* hearing flows necessarily from the fact that a respondent in a proceeding like this one has a right to counsel. *Dodge*, 2013 IL App (1st) 113603, ¶ 20. Respondent suggests that the right to counsel would be meaningless if there were no way to vindicate it.

¶ 55    This is simply not the case. In *In re Detention of Morris*, 362 Ill. App. 3d 321, 324 (2005), the First District considered and rejected on the merits a claim, advanced in a petition brought under section 2-1401 of the Civil Practice Law (735 ILCS 5/2-1401 (West 2000)), that a respondent had received ineffective assistance in a proceeding under the Act. The *Morris* court relied on *People v. Lawton*, 212 Ill. 2d 285, 298 (2004), a supreme court case holding that a respondent in proceedings under the SDPA may raise such a claim in a section 2-1401 petition. Thus, a respondent in a proceeding under the Act has an avenue to vindicate

his or her right to counsel. In fact, "[m]ost jurisdictions considering this issue *** express a clear preference that ineffectiveness claims be raised in collateral review proceedings." *Commonwealth v. Grant*, 813 A.2d 726, 734 (Pa. 2002). We also note that the procedure established in *Krankel* is not required by federal due process principles. See *United States ex rel. Sumner v. Washington*, 840 F. Supp. 562, 570 (N.D. Ill. 1993) (In deciding whether a claim of ineffectiveness had been procedurally defaulted for the purpose of a *habeas corpus* petition, the court, later citing *Krankel*, explained: "As for the failure to interview Barnes and to call her to testify, Sumner's petition for leave to appeal did not raise those matters as an independent claim necessitating review. Instead Sumner contended before the Illinois Supreme Court that review should be granted to decide whether under state law the trial judge had improperly failed to order a new post-trial hearing to determine if trial counsel had been ineffective[ ] ***."); see also *Dolis v. Gilson*, No. 07 C 1816, 2009 WL 5166228, at *13 (N.D. Ill. Dec. 23, 2009) ("[The petitioner] does not allege any violation of federal law as determined by the Supreme Court, and no Supreme Court precedent mandates the [*Krankel*] inquiry ***.").

¶ 56    Hence, the procedure set forth in *Krankel* is not an essential component of due process, most jurisdictions do not employ a similar procedure, and an alternate procedure exists through which respondent can assert any potential violations of his right to counsel. As such, we hold that *Krankel* does not apply in cases under the Act, and we need not address respondent's arguments along these lines any further. Any remedy for counsel's alleged incompetence would lie in a collateral attack.

## F. EVIDENTIARY HEARING

¶ 57

¶ 58    Respondent next complains that the trial court failed to conduct an adequate evidentiary hearing on his motion to withdraw his stipulation. He again bases his argument on criminal cases, in this instance two that construe Illinois Supreme Court Rule 604(d) (eff. July 1, 2006). See *People v. Wilk*, 124 Ill. 2d 93 (1988); *People v. Spriggle*, 358 Ill. App. 3d 447 (2005). Respondent contends that the following principles should control:

> "A defendant may seek to withdraw his or her guilty plea on the grounds that the plea was entered based on a misapprehension of fact or of the law, or if there is doubt of the guilt of the accused and the ends of justice would better be served by submitting the case to a trial." *Spriggle*, 358 Ill. App. 3d at 450-51.

As noted above, we find criminal cases to be of limited guidance in civil proceedings. Thus, we will not simply apply such rules wholesale in this case.

¶ 59    Instead, we look to relevant civil principles for guidance. In *Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C.*, 279 Ill. App. 3d 469, 479 (1996), the Fifth District of this appellate court held as follows:

> "Stipulations are not necessarily conclusive. [Citation.] In the exercise of sound judicial discretion and to further the ends of justice, a trial court can relieve the parties from stipulations. [Citation.] On appeal, the trial court's discretion will not be disturbed unless a party proves manifest abuse."

*Bloome* cites *Brink v. Industrial Comm'n*, 368 Ill. 607, 609 (1938), in which our supreme court explained:

- 15 -

"Parties will not be relieved from a stipulation in the absence of a clear showing that the matter stipulated is untrue, and then only when the application is seasonably made. [Citations.] However, courts may, in the exercise of a sound judicial discretion and in the furtherance of justice, relieve parties from stipulations which they have entered into in the course of judicial proceedings, and that discretion will not be interfered with, except where manifest abuse of it is disclosed."

See also *Ellis v. American Family Mutual Insurance Co.*, 322 Ill. App. 3d 1006, 1010 (2001); *Filko v. Filko*, 127 Ill. App. 2d 10, 25-26 (1970). Moreover, in *Sanborn v. Sanborn*, 78 Ill. App. 3d 146, 149-50 (1979), the First District held: "Parties are bound by their stipulations unless such stipulations are shown to be unreasonable, the result of fraud or violative of public policy." Interestingly, the First District did not include in its list that the stipulation is untrue. Nevertheless, that consideration appears in numerous other cases (including those cited above), so we deem it a valid basis as well. From the foregoing, we discern that a party may be relieved from a stipulation where it is clearly shown that the stipulation is untrue, violative of public policy, unreasonable, or procured by fraud. Moreover, the motion to withdraw the stipulation must be timely, and the decision is within the discretion of the trial court. Hence, civil law provides adequate guidance, and we need not import principles from criminal cases.

¶ 60     Respondent moved to withdraw his stipulation in March 2009. In his motion, he asserted that his decision to stipulate was based on the reports by the State's doctors (Wood and Quackenbush), that some of their conclusions were false, and that he would not have stipulated had he been aware of the falsities. Specifically, he alleged that "[t]he risk tables for the Static 99 which were used by the State's evaluators are outdated," "[t]he rearrest estimate figures used in the MnSOST-R are not accurate," and "rape does not fit the 'Paraphilia NOS' classification."

¶ 61     The trial court held a hearing on respondent's motion (albeit not an evidentiary hearing). Respondent argued that "the scientific evidence had changed *since the preparation of the evaluations*." (Emphasis in original.) Respondent's attorney explained that they had become aware of certain defects in the reports by the State's experts "subsequent to the stipulation and basically as a result of the report which was prepared as a predispositional report evaluation." Counsel was presumably referring to Witherspoon's report.

¶ 62     The trial court ruled as follows:

"The Court has reviewed the motions [and] the case law submitted. *** The stipulation was entered on July 8th of 2008, and at the time of the stipulation *** the [respondent] had the benefit of having reviewed the reports of Dr. Quackenbush and Dr. Wood and his own doctor, Dr. Baron ***. The Court went through rights to a trial and hearing with [respondent]. He indicated he had gone over everything with his attorney, that there were no threats or promises, and the Court found that it was knowing and voluntary and accepted the stipulation.

The facts of the stipulation were presented orally on the record as well as the stipulation was in writing presented to [respondent] and it was signed. The Court then ordered a predispositional report, and the State's report was prepared in August of 2008, and Dr. Witherspoon was appointed, the Court granting the [respondent's] *** request for Dr. Witherspoon back in September, and the report was completed in November of 2008. And then a revised report was filed in January of 2009. And it

- 16 -

was in March *** when [respondent] filed his motion to withdraw the stipulation. And [it] was amended on May 26th with the allegations regarding the State's doctors, the conclusions of the State's doctors were false or faulty, and that had he been aware of this, he would not have stipulated.

With regard to *** the withdrawal of the stipulation, the Court finds that although the Attorney General does not agree to the withdrawal, the Court can look to whether or not there is good cause shown and whether or not there was fraud, unreasonableness or any violation of public policy. And just because now with the request of the dispositional report and [respondent] now liking the opinion of the dispositional report and Dr. Witherspoon better than the reports that they had of Dr. Baron or Dr. Wood or Dr. Quackenbush does not elevate this to good cause shown. He had access to his own reports. The stipulation was with full knowledge. It was not timely. And, therefore, no good cause has been shown, and it is not the result of any faulty false fraud, unreasonable, or violative of public policy issues. So there is no due process violation, and the request for a hearing is denied."

We perceive no error in the trial court's decision.

¶ 63    Initially, we find ill taken respondent's claims that the trial court denied the motion based upon its timing or the Attorney General's position on the motion. As for the former, it is true that the trial court cited the untimeliness of the motion when it ruled; however, that was but one of several bases articulated by the trial court. Most significantly, the trial court found that the fact that Witherspoon's report undermined the reports of the State's experts did not constitute good cause to allow respondent to withdraw the stipulation. This finding is wholly independent of the finding on timeliness. The latter contention is disingenuous. The trial court did not rely on the fact that the Attorney General did not agree to the withdrawal; rather, the trial court expressly disregarded the Attorney General's position: "[T]he Court finds that although the Attorney General does not agree to the withdrawal, the Court can look to whether or not there is good cause shown." Neither of these first two contentions is persuasive.

¶ 64    Respondent's most significant challenge to the stipulation concerns the report by Witherspoon. Witherspoon's report contradicted and undermined the reports by Wood and Quackenbush. Respondent contends that, because he alleged that he misapprehended relevant facts, the trial court was required to conduct an evidentiary hearing on the issue. Of course, the necessity for an evidentiary hearing does not arise merely because a party alleges something; what is alleged must be sufficient to create a factual issue requiring resolution. See *Tuite v. Corbitt*, 224 Ill. 2d 490, 526 (2006). Thus, the operative question is whether the existence of Witherspoon's report created such an issue.

¶ 65    We conclude that, in the context of a motion to withdraw a stipulation, it did not. In his motion, respondent alleged three defects in the reports by the State's experts, namely, defects in two actuarial tools and controversy surrounding the diagnosis of paraphilia, NOS, sexually attracted to nonconsenting females. Granting respondent these points, they fall far short of "a clear showing that the matter stipulated is untrue." *Brink*, 368 Ill. at 609. These were but three bases of the State's experts' opinions. There were numerous others. At the beginning of his report, for example, Quackenbush stated that he gathered data from an interview with respondent; an Illinois Department of Corrections (IDOC) "Sex Offender Pre-Release Evaluation"; his IDOC master file; his IDOC medical file; records from the state police; and

- 17 -

arrest records from various local police departments. These included respondent's history of offenses, disciplinary history while incarcerated, and sex-offender treatment history. He also noted respondent's history of substance abuse. Moreover, in addition to the Static-99 and MnSOST-R, Quackenbush considered the results of the PCL-R (Hare Psychotherapy Checklist-Revised). Wood's report cited 20 sources of information. Wood also relied on the results of a penile plethysmography test performed in 2003 that "indicated significant deviant sexual arousal." Given the complexity of the bases of these reports, respondent's ability to point to three alleged defects does not establish their falsity, and none of the other bases for withdrawing a stipulation are present here.

¶ 66   Before leaving this issue, we point out that the issue is not whether respondent would have stipulated if he had known at the time of the stipulation what he subsequently learned. Again, relevant considerations are whether the stipulation is untrue, violative of public policy, unreasonable, or procured by fraud. *Brink*, 368 Ill. at 609; *Sanborn*, 78 Ill. App. 3d at 149-50. The mere fact that a party might have come to a different decision on whether to stipulate is not one of the allowable bases to undo a stipulation. Having failed to allege anything that would have established one of these factors, we cannot say that the trial court needed to hold an evidentiary hearing on respondent's motion.

¶ 67                              G. *FRYE*

¶ 68   Respondent finally contends that the trial court should have held a *Frye* hearing regarding the methods employed by Wood and that, in turn, it should have barred Wood from testifying at the dispositional hearing. Respondent contends that the diagnosis by Wood–paraphilia, NOS, sexually attracted to nonconsenting females, nonexclusive type–has not achieved general acceptance in the scientific community of experts who specialize in diagnosing and treating sex offenders. The State responds that a diagnosis is not a methodology and is not subject to *Frye* and that, if *Frye* applies, this diagnosis passes the *Frye* test.

¶ 69   The *Frye* test requires the proponent of evidence derived from a new or novel scientific methodology to demonstrate that it is " 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004) (quoting *Frye*, 293 F. at 1014). Universal acceptance is not necessary. *Id*. at 530. In fact, "general acceptance" does not even require that a majority of experts in the field accepts the methodology. *Id*. It is sufficient that a significant subset of experts reasonably relies upon the methodology. *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 965 (2006).

¶ 70   The State's contention that a diagnosis (as opposed to a methodology) is outside the scope of *Frye* has been rejected on three occasions by the First District. See *In re Detention of Hayes*, 2014 IL App (1st) 120364, ¶ 34; *In re Detention of Melcher*, 2013 IL App (1st) 123085, ¶ 56; *New*, 2013 IL App (1st) 111556, ¶ 47. The First District's rationale is that "a prerequisite for a diagnosis is scientific evidence that such a mental condition exists" and that "[a] *Frye* hearing is appropriate to determine whether an emerging diagnosis is an actual illness or disorder." *New*, 2013 IL App (1st) 111556, ¶ 53. We find this reasoning persuasive and reject the State's contention here as well.

¶ 71   The First District is split as to whether this diagnosis satisfies *Frye*. In *Hayes* and *Melcher*, it held that the diagnosis met the general-acceptance standard. In *Melcher*, 2013 IL App (1st) 123085, ¶ 60, the court, quoting *In re Detention of Lieberman*, 2011 IL App (1st)

090796, ¶ 53, observed that the diagnosis had " 'been the basis for numerous probable cause or sexually violent person findings in this state and other jurisdictions outside of this state.' " The *Melcher* court also cited *McGee v. Bartow*, 593 F.3d 556 (7th Cir. 2010), where the Seventh Circuit "conducted an extensive analysis of the validity of the diagnosis in addressing whether a civil commitment predicated thereon satisfied due process." *Melcher*, 2013 IL App (1st) 123085, ¶ 61. It noted that the *McGee* court ultimately concluded that "the diagnosis of a paraphilic disorder related to rape is not so unsupported by science that it should be excluded absolutely from consideration by the trier of fact." *McGee*, 593 F.3d at 580.

¶ 72    In *Hayes*, 2014 IL App (1st) 120364, ¶¶ 35-36, the court recognized that, as the diagnosis had been found to satisfy *Frye* in *Melcher*, "a *Frye* hearing was unnecessary." We have previously noted that the issues that arise in a *Frye* hearing typically transcend any particular case. *Sandry*, 367 Ill. App. 3d at 963 (citing *Simons*, 213 Ill. 2d at 531). As *Melcher* and *Hayes* are persuasively reasoned, they provide strong support for the notion that a *Frye* hearing was not necessary in this case to assess whether the paraphilia, NOS, nonconsent diagnosis is generally accepted by a significant subset of the community of specialists who work with sex offenders.

¶ 73    Conversely, in *New*, 2013 IL App (1st) 111556, a case involving an analogous diagnosis (paraphilia, NOS, sexually attracted to adolescents), the First District reversed an order of commitment and remanded for a *Frye* hearing on the validity of the diagnosis. *New* was decided before *Hayes* and *Melcher* and therefore did not have the benefit of their analysis. Moreover, the *New* court's reasoning does not comport with a proper analysis pursuant to *Frye*. In addressing general acceptance, it noted that the respondent had "raised serious questions regarding the validity and unorthodoxy of the State's diagnosis of paraphilia not otherwise specified sexually attracted to adolescent males, also known as hebephilia." *Id.* ¶ 61. A true *Frye* analysis does not involve an inquiry into a methodology's validity. See *Simons*, 213 Ill. 2d at 532 ("Under the *Frye* standard, the trial court is not asked to determine the validity of a particular scientific technique."). Furthermore, *New* cited the fact that there was "controversy" surrounding the diagnosis. *New*, 2013 IL App (1st) 111556, ¶ 61. However, the mere fact that the experts who accept a methodology do not constitute a majority does not mean that a methodology fails to satisfy *Frye*'s standard for admissibility. *Sandry*, 367 Ill. App. 3d at 965. Rather, such concerns go to the weight of such evidence. *Id.* at 977 ("Further questions about the reliability of the procedure are matters that can be explored at trial.").

¶ 74    In sum, we hold, in accordance with *Hayes* and *Melcher*, that a *Frye* hearing was not necessary regarding the paraphilia, NOS, nonconsent diagnosis. Any methodological defects in the diagnosis went to the weight of such evidence and would have been properly addressed before the trial court.

¶ 75                                IV. CONCLUSION
¶ 76    In light of the foregoing, the judgment of the circuit court of Lake County is affirmed.

¶ 77    Affirmed.